[No. A080316. First Dist., Div. One. Feb. 28, 2000.]

SHADE FOODS, INC., Plaintiff and Appellant, v.
INNOVATIVE PRODUCTS SALES & MARKETING, INC., Defendant,
Cross-complainant and Appellant;
ROYAL INSURANCE COMPANY OF AMERICA, Defendant and
Appellant;
NORTHBROOK NATIONAL INSURANCE COMPANY, Defendant,
Cross-defendant and Appellant.

848

852

854

856

**COUNSEL**

Joseph A. Hearst; Pillsbury, Madison & Sutro and Reginald D. Steer for Plaintiff and Appellant.

Emerich, Pedreira & Fike and David A. Fike for Defendant, Cross-complainant and Appellant.

Musick, Peeler & Garrett, David A Tartaglio, Cheryl A. Orr; Lynch, Gilardi & Grummer, Richard S. Gilardi, Susan M. Carbone; Stephan, Oringher, Richman & Thesdora, Ginsburg, Stephan, Oringher & Richman, Harry W. R. Chamberlain II and Robert M. Dato for Defendant and Appellant.

Ropers, Majeski, Kohn & Bentley and Susan H. Handelman for Defendant, Cross-defendant and Appellant.

## OPINION

**SWAGER, J.**—Two insurance carriers, Northbrook National Insurance Company (Northbrook) and Royal Insurance Company of America (Royal) appeal from a judgment awarding compensatory and punitive damages to two insureds, Innovative Products Sales & Marketing, Inc. (IPS) and Shade Foods, Inc. (Shade). We reverse the judgments for punitive damages and modify a portion of the judgment pursuant to the other-insurance clause in the policies but otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Shade is a wholesale food manufacturer that makes ingredients for larger food product companies. According to Shade's senior vice-president, General Mills is "by far" its largest customer and accounts for a "very large percentage" of its total sales. In cooperation with General Mills, Shade developed a process for manufacturing nut clusters composed mainly of diced almonds and congealed syrup with small portions of walnuts and pecans. Shade began manufacturing this product at a plant in Kansas in the late 1980's for use in a General Mills breakfast cereal called "Clusters." In 1993 and 1994, it sold about $12 million of the product to General Mills under a standard purchase order.

Shade initially purchased processed almonds from various suppliers in California for manufacture of nut clusters. In 1992 and 1993, Skip Petitt, an almond processor in Madera, California, made a bid for this business by forming IPS and installing equipment in his plant for roasting and dicing almonds to the specifications required for the product. Shade ultimately entered into an agreement with IPS for the supply of processed almonds during a three-year period beginning in October 1993. During the first months of the agreement, Shade ordered a relatively modest supply of almonds, but it began increasing its orders in 1994 and purchased its entire supply of almonds from IPS in March 1994.

In 1994, Shade was insured by a commercial general liability policy issued by Royal with limits of $2 million per occurrence. IPS was insured by a package policy issued by Northbrook that provided general liability coverage with a $1 million limit per occurrence and property coverage for

"stock" with a $3 million limit. The Northbrook liability insurance policy contained a vendor's endorsement that named Shade as an additional insured.

On April 5, 1994, General Mills notified Shade that wood had been found in the nut clusters used in its boxed cereals. Shade itself did not use wood in proximity to the facilities used to manufacture the product and suspected that the processed almonds supplied by IPS were the source of the problem. Upon manually inspecting 80,000 pounds of diced almonds from IPS, it found 295 pieces of wood splinters, weighing about a quarter of a pound. Many of the pieces were potentially injurious to consumers, being sharply pointed and one-fourth inch to two or three inches long. Shade identified a possible source of the contamination in a "bin lifter" at the IPS plant which dumped loads of almonds on wooden pallets into a hopper that fed a conveyor belt.

General Mills shut down its production of Clusters cereal, shipped its supply of nut clusters back to Shade, and destroyed its entire stock of contaminated boxes of cereal. Shade was unable to find any use for the contaminated nut clusters, but it was able to mitigate its losses on its stock of diced almonds by grinding the almonds into powder and selling them as almond paste. General Mills presented Shade with a claim that was ultimately reduced to the precise figure of $1,347,932.20. About $1 million of this sum represented the value of cereal it was compelled to destroy.

Upon learning of the wood contamination, both IPS and Shade promptly submitted claims to Northbrook and Royal, respectively. Royal appointed counsel to represent Shade and issued a coverage letter dated October 12, 1994, that appeared to offer coverage of $1 million, but, three months later, it informed Shade that it would pay for only 5 or 10 percent of the General Mills claim, or at most $150,000, representing its estimate of Shade's potential exposure to liability to General Mills. Northbrook denied liability insurance coverage in separate letters to IPS and Shade dated July 5, 1994, and August 5, 1994, respectively. Though it never reconsidered its denial of coverage to IPS, Northbrook entered into negotiations with Shade for a period of months and made a highly conditional offer of $1 million in settlement of the General Mills claim in June of 1995. Meanwhile, Shade paid the full amount of the General Mills claim and calculated that its total losses caused by the wood contamination amounted to $2,454,557.70.

On June 1, 1995, Shade brought an action for damages against IPS, Northbrook and Royal. The complaint alleged causes of action for negligence, breach of contract and breach of warranty against IPS and stated

claims for breach of contract and breach of the implied covenant of good faith and fair dealing against the insurers. With respect to Northbrook, Shade alleged rights as a third party beneficiary of its insurance policy with IPS. IPS subsequently filed a cross-complaint against Northbrook, alleging breach of contract and breach of the implied covenant. Both the complaint and cross-complaint sought punitive as well as compensatory damages.

The case came up for jury trial in November 1996. With the agreement of the parties, the court divided the trial into two phases and submitted special verdicts to the jury after each phase. The first phase concerned the liability of the insureds, Shade and IPS, for the losses resulting from the almond contamination; the second phase concerned the liability of the insurers to the insureds.

At the conclusion of the first phase, the jury completed a 15-question special verdict that, in general, found IPS liable to Shade on the basis of negligence, breach of contract, and breach of warranty, and found Shade liable to General Mills for breach of implied warranty. The verdict determined that the total damages suffered by Shade amounted to $2,146,640.60. After the second phase, the jury found that Northbrook breached the implied covenant of good faith and fair dealing toward both IPS and Shade and that Royal breached the implied covenant toward Shade. The verdict found that IPS had suffered business losses as a result of Northbrook's breach in the amount of $816,000 and made three separate awards of punitive damages against Northbrook and Royal.

At various times during the trial, the court received arguments and made determinations on issues of insurance coverage. With respect to coverage issues under the Northbrook policy, the court ruled before trial that there was potential liability and reserved a final determination until after the jury trial. In an order entered July 22, 1997, the court resolved all coverage issues against Northbrook. With respect to Royal's coverage, the court similarly found potential liability in a ruling before trial. Later, after hearing several days of testimony on the issue, the court found that Royal had not waived and was not estopped to contest Shade's liability to General Mills as a defense to its indemnification obligation.

With the consent of the parties, the court determined the entitlement of IPS and Shade to an award of attorney fees as damages through the procedure of posttrial motions, based on the jury's finding of the insurers' breach of the implied covenant of good faith and fair dealing. The court also received arguments dealing with the award of interest on the jury's verdict. Both these issues were resolved in the final judgment entered July 22, 1997.

The final judgment involved a complex series of awards which may be divided into awards entered against Northbrook and against Royal. Against Northbrook: (1) $1,761,226.58 jointly to IPS and Shade as compensatory damages, consisting of $1 million for liability insurance coverage and $761,226.58 for property insurance coverage, plus interest; (2) $813,394 to IPS as compensatory damages for business losses, plus interest;[1] (3) $2 million to IPS in punitive damages; (4) $445,950.47 to Shade as damages for attorney fees and expenses, plus interest; and (5) $3 million to Shade in punitive damages. Against Royal: (1) $1,054,419.50 to Shade as compensatory damages for liability insurance coverage, plus interest; (2) $447,637.28 to Shade as damages for attorney fees and expenses, plus interest; and (3) $8 million to Shade in punitive damages.

Northbrook and Royal submitted extensive posttrial motions to vacate the judgment and for new trial and judgment notwithstanding the verdict, and, upon denial of the motions, filed timely notices of appeal from the final judgment and orders denying posttrial motions.[2]

## DISCUSSION

### I. Judgment Against Northbrook

#### A. Liability Insurance Coverage Issues

The portion of the judgment jointly awarding IPS and Shade a judgment of $1 million against Northbrook, representing the policy limit of Northbrook's commercial general liability policy, presents several issues applying equally to the insurance coverage of both insureds as well as issues pertaining solely to Shade's coverage under the vendor's endorsement.

##### 1. Property Damage

■ We turn first to Northbrook's contention that the damages claimed by IPS and Shade do not constitute "property damage" within the meaning

---

[1]The amount of $816,000 in the final judgment was later reduced to $813,394 by consent of the parties.

[2]IPS also filed a notice of appeal from the judgment insofar as it failed to award interest on punitive damages for the period between the jury's verdict and the entry of the final judgment. Shade filed a similar notice of appeal from the judgment with respect to interest on punitive damages and also appealed the judgment "insofar as it reflects rulings by the Court that defendant Royal had not waived, and was not estopped to assert, non-coverage . . . for Shade's settlement with General Mills, Inc." We do not reach the cross-appeals in this opinion. Our decision to reverse the judgments for punitive damages renders moot the issue of interest on these judgments, and our textual analysis of the insurance policies suffices to uphold the judgment for indemnification, making it unnecessary to consider the alternative equitable ground for finding coverage.

of the insuring agreement. The insuring clause obligates the insurer to "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or *property damage* to which this insurance applies." The term "property damage" is defined in relevant part as follows: "Property damage means: [¶] a. Physical injury to tangible property, including all resulting loss of use of that property."

Northbrook relies on a line of cases holding that the diminution in the value of a product by reason of a defective part or faulty workmanship does not constitute property damage within the meaning of the standard insuring clause at issue here. (*Golden Eagle Ins. Co. v. Travelers Companies* (9th Cir. 1996) 103 F.3d 750 [faulty construction of apartment building]; *New Hampshire Ins. Co. v. Vieira* (9th Cir. 1991) 930 F.2d 696, 697-701 [faulty installation of drywall]; *Hamilton Die Cast, Inc. v. United States F. & G. Co.* (7th Cir. 1975) 508 F.2d 417, 419 [defective tennis racket frame]; *Seagate Technology v. St. Paul Fire and Marine Ins.* (N.D.Cal. 1998) 11 F.Supp.2d 1150, 1154-1155 [defective disk drive in computer]; *St. Paul Fire & Marine Ins. Co. v. Coss* (1978) 80 Cal.App.3d 888, 892-893 [145 Cal.Rptr. 836] [defective materials used in construction of a house]; *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272, 284 [142 Cal.Rptr. 681] [defective head gasket in car].)

This line of authority, however, must be distinguished from other cases finding property damage when a defective part causes injury to other property. (*Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 565 [334 P.2d 881].) Thus, in *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.* (7th Cir. 1992) 972 F.2d 805, a defective plumbing system caused water leakage within a year or more after it was installed in houses and apartments. Finding property damages within the meaning of the standard-form definition at issue here, the court held that the term includes "loss that results from physical contact, physical linkage, as when a potentially dangerous product is incorporated into another and . . . must be removed, at some cost, in order to prevent the danger from materializing." (*Id.* at p. 810.)

While the distinction may sometimes be a fine one to draw, we see no difficulty in finding property damage where a potentially injurious material in a product causes loss to other products with which it is incorporated. Our decision in *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690] is closely in point. There, the insured was sued repeatedly for the manufacture of asbestos-containing building material, such as floor tile and insulation. In general, the plaintiffs sought damages for the cost of removing the material or for the diminished

value of the building resulting from its presence. Relying on *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co., supra,* 972 F.2d 805, we noted that the presence of asbestos causes injury to a building "because the potentially hazardous material is physically touching and linked with the building . . . ." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., supra,* at p. 92.) We concluded "that the alleged injury from installation of [asbestos-containing building material] qualifies as 'physical injury to . . . tangible property' " under the terms of the standard-form policy. (*Id.* at p. 94.)

Following our decision in *Armstrong*, we hold that the presence of wood splinters in the diced roasted almonds caused property damage to the nut clusters and cereal products in which the almonds were incorporated.

### 2. Business-risk Exclusions

While broadly claiming the benefit of business-risk exclusions in the commercial general liability policy, Northbrook's briefs specifically address only the impaired-property exclusion (exclusion 2(m)) and the care, custody or control exclusion (exclusion 2(j)(4)).[3] We will limit our analysis to these two provisions.

■ Exclusion 2(m) excludes coverage for "Property damage to impaired property . . . arising out of : [¶] (1) A defect, deficiency, inadequacy or dangerous condition in your product or your work . . . ." The term "impaired property" is defined in pertinent part as follows: " 'Impaired property' means tangible property, other than your product or your work that cannot be used or is less useful because: [¶] a. It incorporates your product or your work that is known or thought to be defective, deficient, inadequate or dangerous . . . *if such property can be restored to use by:* [¶] . . . *The repair, replacement, adjustment or removal of your product . . . .*" (Italics added.) The exclusion reflects the principle that, "[a]s a general matter, the risk of replacing or repairing a defective product is considered a commercial risk which is not passed on to a liability insurer." (*Seagate Technology v. St. Paul Fire and Marine Ins., supra,* 11 F.Supp.2d at p. 1155.)

Northbrook has presented no evidence that the contaminated products manufactured from the diced almonds could be "restored to use" by removal of the wood splinters. Indeed, it is fanciful to suppose that the nut clusters composed of congealed syrups and diced nuts or the boxed cereal product containing the nut clusters could be somehow deconstructed to remove the injurious splinters and then recombined for their original use. At most,

---

[3]The business-risk exclusions encompass 2(j), (k), (l), (m) and (n).

Shade possessed the possibility of realizing some salvage value by selling the product at a reduced value for some other use. The salvage of a damaged product, however, is obviously not equivalent to restoring it to use by the repair or replacement of a defective component.

■ Exclusion 2(j)(4) extends to "Property damage to: . . . (4) Personal property in the care, custody or control of any Insured." The exclusion, of course, can have no application to contaminated boxes of cereal in the possession of General Mills, which was never a party to the insurance policy. On the other hand, the parties have stipulated that the exclusion does apply to the stock of contaminated almonds, valued at $761,226.58, that was not incorporated into nut clusters. The dispute concerns whether the exclusion applies to the stock of contaminated nut clusters in Shade's possession.

The exclusion would have no conceivable application to these contaminated nut clusters if Shade had not been named as an additional insured; the only insured then would be IPS, which did not have possession of the damaged nut clusters. Northbrook argues, however, that by adding Shade as an additional insured under a vendor's endorsement it brought Shade within the term "any insured" in exclusion 2(j)(4) and thereby reduced, rather than expanded, its liability coverage. We reject this interpretation. The courts "generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253], fn. omitted.) It would be manifestly contrary to the reasonable expectations of the parties to hold that Shade and IPS lost insurance coverage that would otherwise be available to them by making Shade an additional insured under the vendor's endorsement. The term "any insured" does not compel this unreasonable interpretation. The term can reasonably be limited to parties insured under the policy itself, excluding the distinct form of coverage provided by the vendor's endorsement.

### 3. *Vendor's Endorsement*

■ Northbrook also maintains that the vendor's endorsement does not extend coverage to Shade because of exclusions 1(c) and (g) in the endorsement itself. The pertinent exclusions provide: "1. The insurance afforded the vendor does not apply to: [¶] . . . [¶] c. Any physical or chemical change in the product made intentionally by the vendor; [¶] . . . [¶] g. Products which, after distribution or sale by you, have been . . . used as . . . part or ingredient of any other thing or substance by or for the vendor." The incorporation of the diced almonds into nut clusters and cereal products,

Northbrook argues, had the effect of relieving it of any insurance obligation because the almonds were then changed and used as an ingredient of another thing.

There is, however, no logical reason to treat changes in the product or its subsequent use as an ingredient in another product as excluding coverage unless the changes or subsequent use *cause* the injury to the third party claimant. Accordingly, the courts have held that similar exclusions apply only if there is a nexus or causal connection between the vendor's action and the claimant's injuries. (*Sears, Roebuck and Co. v. Reliance Ins. Co.* (7th Cir. 1981) 654 F.2d 494; *SDR Co. v. Federal Ins. Co.* (1987) 196 Cal.App.3d 1433, 1437 [242 Cal.Rptr. 534]; *Oliver Machinery Co. v. United States Fid. & Guar. Co.* (1986) 187 Cal.App.3d 1510 [232 Cal.Rptr. 691].) Here, the property damage was caused by a defect in the diced almonds, i.e., wood splinters, existing at the time they were sold to Shade. The processing of the almonds into nut clusters by Shade and their subsequent incorporation as an ingredient in cereal did not create any new risk or introduce a distinct defect causing the third party injury.

The two California decisions construing similar exclusions in vendor's endorsements have both relied extensively on a federal decision, *Sears, Roebuck and Co. v. Reliance Ins. Co., supra,* 654 F.2d 494. We also adopt the reasoning of that decision. The *Sears, Roebuck* decision concerned a flammable fabric that was incorporated into slacks and relabeled. The insurance carrier argued that the relabeling and use of the product as part of another product came within exclusions in the vendor's endorsement. Rejecting this interpretation the court stated, "[T]he construction suggested by the carrier is not reasonable. That construction would nullify the very purpose of the vendor's endorsement, causing a forfeiture where the parties intended coverage. This court must assume that Commercial intended to insure Sears under the vendor's endorsement of its policy unless there is a nexus between changes made by Sears and the injuries. Any other assumption would allow the carrier to simply accept the premium and avoid any corresponding obligation." (*Sears, Roebuck and Co. v. Reliance Ins. Co., supra,* at pp. 498-499.)

In the case at bar, Northbrook is similarly advancing an interpretation of the exclusions that would render the vendor's endorsement a nullity since the diced almonds were produced for the purpose of being incorporated into nut clusters which would be resold as an ingredient in breakfast cereal. We see no reasonable basis for interpreting the exclusions in such a manner that they would effectively retract the coverage extended in the vendor's endorsement itself.

### 4. *Insuring Clause of Liability Insurance Policy*

As a further challenge to the judgment of $1 million for the limit of its liability insurance coverage of IPS, Northbrook argues that Shade's claim for damaged almond clusters and boxed cereals is not covered by the insuring agreement of its liability insurance policy because it arose out of breach of contract. Coverage for contract damages is often precluded by multiple provisions in standard liability insurance policies. Since contract damages are measured by the disappointed expectations of the parties to an agreement,[4] they usually do not involve an accidental occurrence or a covered injury, such as property damage and bodily injury, and they are likely to fall within one of the business-risk exclusions. The present case is only a partial exception to this generalization; as we have seen, a substantial portion of the damages is excluded from liability insurance coverage by the business-risk exclusion for personal property in the care, custody, or control of the insured.

A line of decisions stemming from *International Surplus Lines Ins. Co. v. Devonshire Coverage Corp.* (1979) 93 Cal.App.3d 601, 611 [155 Cal.Rptr. 870], went a step further and interpreted the "legally obligated to pay" language in the insuring agreement as embodying a categorical exclusion of coverage for contract damages. This authority was recently abrogated in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229]. Our analysis here need go no further than the *Vandenberg* decision.

In *Vandenberg,* the plaintiff filed an action against his insurers, alleging various causes of action arising out of their failure to defend, settle, or indemnify an action by a third party. The insurers sought summary adjudication on the ground that the third party action had resulted in an award of damages for breach of a lease, a contractual cause of action. The trial court granted summary adjudication, but the Court of Appeal issued peremptory writs of mandate, reversing the summary adjudication order. The order of the Court of Appeal was based on the reasoning that, "when there is damage to property, the focus of the inquiry should be the nature of the risk or peril that caused the injury and the specific policy language, not the form of action brought by the injured party." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 828.)

Affirming the decision of the Court of Appeal, our Supreme Court held, "In holding that coverage for property damage losses is not necessarily

---

[4]For a more precise analysis of contract damages, see Restatement Second of Contracts, sections 344 and 347.

precluded because they are pled as contractual damages, the Court of Appeal properly focused on the property itself and the nature of the risk causing the injury. . . . Coverage under a [commercial general liability] insurance policy is not based upon the fortuity of the form of action chosen by the injured party. Thus, as the Court of Appeal stated, determination of coverage must be made individually by considering 'the nature of [the] property, the injury, and the risk that caused the injury, in light of the particular provisions of each applicable insurance policy.' " (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 838.) The Supreme Court further explained, "Nothing in the respective policies between Vandenberg and any of the insurers suggests any special or legalistic meaning to the phrase 'legally obligated to pay as damages.' A reasonable layperson would certainly understand 'legally obligated to pay' to refer to any obligation which is binding and enforceable under the law, whether pursuant to contract or tort liability." (*Id.* at p. 840.)

In the present case, the jury found that IPS was negligent and that it breached implied and express warranties to Shade. The latter finding was based on jury instructions presenting alternative theories of breach of warranty, including breach of express warranty, implied warranty of merchantability, and implied warranty of fitness for particular purpose.

In light of the *Vandenberg* decision, the insuring agreement clearly now covers IPS's liability for negligence. The *Vandenberg* court decisively rejected the interpretation of the "legally obligated to pay" language as precluding coverage for cases involving both contractual and tort liability for the same loss: "[T]he arbitrariness of the distinction between contract and tort in the *International Surplus* [*Lines Ins. Co. v. Devonshire Coverage Corp., supra,* 93 Cal.App.3d 601] line of cases is evident when we consider the same act may constitute both a breach of contract and a tort. [Citation.] Predicating coverage upon an injured party's choice of remedy or the form of action sought is not the law of this state. [Citation.] . . . Instead, courts must focus on the nature of the risk and the injury, in light of the policy provisions, to make that determination." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 840.)[5]

We also consider that the insuring agreement poses no bar to coverage for liability based on breach of warranty. If the claim comes within the policy

---

[5]Even before the *Vandenberg* decision, we think the present case would be beyond the reach of the decisions construing the "legally obligated to pay" language as precluding coverage of contract-related claims. The duty to avoid the harm resulting from contaminating foodstuffs is based rather on the foreseeable nature of the harm and is therefore independent of the contractual relationship between the actor and the owner of the foodstuffs. Thus, IPS's liability for negligence was not predicated on its contract with Shade.

provisions relating to the nature of the covered damage and risk, we need only ask whether the insured is subject to a binding legal obligation to pay the claim so as to come within the insuring agreement. Indeed, we would reach this conclusion even before the *Vandenberg* decision to the extent that IPS's liability was based on breach of the implied warranty of merchantability for foodstuffs. In the peculiar context of foodstuffs, the theory of breach of an implied warranty of merchantability has closer affinities to tort law than to contract law because it allows recovery of damages, without regard to privity of contract, for personal injuries as well as economic loss. (*Mexicali Rose v. Superior Court* (1992) 1 Cal.4th 617, 621 [4 Cal.Rptr.2d 145, 822 P.2d 1292]; *Klein v. Duchess Sandwich Co., Ltd.,* (1939) 14 Cal.2d 272, 284 [93 P.2d 799]; *Vassallo v. Sabatte Land Co.* (1963) 212 Cal.App.2d 11, 17 [27 Cal.Rptr. 814]; *Vaccarezza v. Sanguinetti* (1945) 71 Cal.App.2d 687, 689 [163 P.2d 470].)[6]

### 5. *Other-insurance Clause*

Northbrook implicitly raises the issue of the other-insurance clause by arguing that the judgment "greatly overcompensates Shade." We analyze this issue in the portion of the opinion dealing with the judgment against Royal because of its relevance to Royal's good faith obligations. (See *post*, at pp. 896-902.) For the reasons stated there, we reverse the judgment jointly awarding IPS and Shade $1 million against Northbrook (and the judgment awarding Shade $1,054,419.50 against Royal), and remand the case to the trial court for modification of this portion of the judgment in compliance with the other-insurance clauses in the liability insurance policies.

### B. *First Party Coverage Issues*

### 1. *IPS Property Insurance Coverage for Stock at Its Facility*

In addition to securing a judgment of $1 million under Northbrook's liability insurance coverage, IPS and Shade jointly recovered a

---

[6]We see no significance in the fact that the contract between Shade and General Mills was governed by Minnesota law rather than by California law. IPS was liable to *both* Shade and General Mills for selling contaminated almonds in breach of the implied warranty of merchantability. After settling with General Mills, Shade secured an assignment of its rights against IPS, which included rights premised on breach of the California doctrine of implied warranty of merchantability for foodstuffs. It is true that the special verdict did not include findings on IPS's breach of implied warranty to General Mills, but a breach of IPS's implied warranty of merchantability toward Shade necessarily entailed a breach of the same warranty to General Mills; hence, the finding with respect to Shade sufficed as a factual predicate for the judgment, leaving the court nothing "but to draw from [it] conclusions of law." (Code Civ. Proc., § 624; see also *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596].)

judgment of $761,226.58, based on Northbrook's first party property insurance coverage, which was measured by the value of the damaged stock of diced almonds. We turn now to the issues relating to this first party coverage for property damage.

The property insurance portion of the Northbrook policy included a complex set of provisions relevant to the loss of the stock of diced almonds. The "Building and Personal Property Coverage Form (Special)" provided that Northbrook "will pay for direct physical loss of or damage to covered property at the premises described in the declarations of this coverage part caused by or resulting from any covered cause of loss." The property declarations relating to this coverage listed "stock" as having "special" coverage within a limit of $3 million of insurance. The term "stock" was defined to mean "merchandise held in storage or for sale, raw materials and goods in process or finished . . . ." The term "covered causes of loss" was defined to mean simply a "physical loss" not excluded by an exclusion or limited by a limitation on coverage. Exclusion 3(c)(2) provides: "3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage from a covered cause of loss results, we will pay for that resulting loss or damage. . . . [¶] c. Faulty, inadequate or defective: . . . [¶] (2) . . . workmanship . . . ."

While negotiating with IPS for an almond-processing agreement, Shade insisted on property insurance coverage for the stock of almonds processed by IPS. To obtain the needed insurance, IPS's president, Skip Petitt, approached an insurance broker, Michael Der Manouel with whom he had an existing relationship, who was president of the San Joaquin Valley Insurance Associates, Inc. Der Manouel was an authorized agent of Northbrook. His agency agreement with Northbrook appointed his firm as Northbrook's "agent for the writing of the types of insurance specified" and gave it authority to "[b]ind coverage and execute insurance contracts" and "[p]rovide all the usual and customary services of an insurance agent . . . ." For several years, Der Manouel had secured insurance coverage for Petitt's other almond processing business, Classic Roasters, which Petitt operated at the same location as the IPS facility. Two years earlier, Der Manouel had placed the Classic Roasters insurance with Northbrook.

As in the case of IPS, Classic Roasters did not itself own the almonds it processed but rather processed almonds purchased by another company for a processing fee. In applying for renewal of the Northbrook policy in 1993,

Classic Roasters asked for $3 million of coverage for "stock" and referred somewhat obscurely to its relationship with its supplier.[7]

Der Manouel testified that Petitt asked him to obtain the same kind of coverage for IPS that he had for Classic Roasters. He understood that Petitt wanted insurance coverage for the value of the product in its possession at the IPS facility. To this end, he issued a change endorsement stating that IPS was included as a named insured in the Classic Roasters policy. In his view, it did not matter whether the almonds belonged to IPS or to another party. He was asked: "Q. Why wasn't it a concern?" "A. Well, we wanted to provide a policy with limits of liability that would protect anybody's product that was on the insured's premises . . . [and] as long as we were insured to value on the product that was on the premises, we didn't care who [sic] it belonged to." "Q. So would it be accurate for me to say that you were intending to protected [sic] the product on the premises regardless of who [sic] it belonged to?" "A. That's correct."

The change endorsement including IPS as a named insured increased the "premium bases" from $12 million to $15 million, named Shade as an additional insured, and charged an additional premium of $4,606. The underwriter explained that, with the inclusion of IPS as a named insured, the listed coverage for "stock" did not change but the premium base increased so as to reflect an additional $3 million in estimated gross receipts attributable to IPS.

In construing first party coverage under the Northbrook policy, we are guided by familiar principles of insurance policy interpretation. ■ "In the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured." (*AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at p. 822, fn. omitted; *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 667 [42 Cal.Rptr.2d 324, 913 P.2d 878].) In contrast, " 'exclusionary clauses are interpreted narrowly against the insurer. [Citations.]' [Citations.]" (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 808 [180 Cal.Rptr. 628, 640 P.2d 764].)

■ The property damage portion of the Northbrook policy, if broadly construed, applies on its face to damage occurring on the IPS premises to the

---

[7]The application sought coverage for "products under label of others" and explained that it "packages some products for others." The Northbrook underwriter nevertheless insisted that he was unaware that Classic Roasters did not own the stock listed by the policy.

stock of almonds that IPS processed for Shade. The definition of "stock" as "merchandise held in storage" and "goods in process or finished" is broad enough to include the inventory of diced almonds. Exclusion 3 presents some difficulty in interpretation because it is subject to an obscurely worded qualification, but, consistent with the narrow interpretation of exclusionary clauses, the qualifying language may reasonably be construed as applying to the present case, thereby causing the exclusion to be inapplicable. The qualifying language provides: "if loss or damage from a covered cause of loss results, we will pay for that resulting loss or damage." In light of the use of the term "covered cause of loss" in this section of the contract, the language plausibly may be read as saying that, if physical loss to property occurs, the policy will pay for this loss. Despite Northbrook's argument to the contrary, we think it is obvious that the contamination of the almonds with wood splinters, requiring their destruction, constituted physical loss of the stock. (*Pillsbury Co. v. Underwriters at Lloyd's, London* (D.Minn. 1989) 705 F.Supp. 1396, 1397-1399.)

This interpretation unquestionably squares with the objectively reasonable expectations of the insured. Petitt was in the business of processing almonds for others. He kept inventories of processed goods on his premises and then shipped them to his customers for marketing. The insurance coverage for "stock" would be meaningless if it did not apply to the almonds, owned by others, that were processed at his plant. Again, the coverage for physical damage on his premises would be illusory if it were forfeited by transporting the products to another location.

Furthermore, as the trial court found, Northbrook was bound by its agent's interpretation of coverage under the policy. In general, an agent " '. . . may bind the company by any acts, agreements or representations that are within the ordinary scope and limits of the insurance business entrusted to him . . . .' [Citation.]" (*Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289, 298 [202 Cal.Rptr. 47].) This authority unquestionably extends to giving ambiguous contract provisions an interpretation that the insurer itself might reasonably adopt. Here, Petitt approached Northbrook's agent, Der Manouel, with a need to secure insurance coverage for the stock of almonds processed at his facility. Der Manouel assured him, with a reasonable basis in contract language, that the insurance policy provided such coverage. Northbrook is bound by its agent's interpretation of the contract. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 2:42, p. 2-9.)

Northbrook's arguments implicitly raise the further issue of whether IPS had an insurable interest in the stock of almonds at its facility. The absence

of such an insurable interest might demand a different interpretation both of the insurance policy and Der Manouel's authority. ■ The classic definition of an insurable interest is found in *Davis v. Phoenix Ins. Co.* (1896) 111 Cal. 409 [43 P. 1115]: "It is held sufficient that the insured has a direct pecuniary interest in the preservation of the property, and that he will suffer a pecuniary loss as an immediate and proximate result of its destruction." (*Id.* at p. 414; see also *Royal Insurance Company v. Sisters of Presentation* (9th Cir. 1970) 430 F.2d 759, 761; *California Food Service Corp. v. Great American Ins. Co.* (1982) 130 Cal.App.3d 892, 897 [182 Cal.Rptr. 67].) Under this definition, IPS clearly had an insurable interest in the stock of almonds that Shade delivered to its facility for processing. It would be directly liable both under principles of agency (cf. Ins. Code, § 285) and under its almond-processing agreement for loss of almonds during processing at its facility. Hence, it had a direct pecuniary interest in their preservation and stood to incur a loss as a result of their physical loss on its premises.

Reflecting these familiar principles of insurance law, the definition of "covered property" in the insurance policy itself included "[p]roperty *of others* for which you are legally liable, providing an entry for such coverage and limit of insurance are shown in section 4 of the declarations of this coverage part." (Italics added.) As noted earlier, section 4 of the declaration included coverage for stock.

### 2. *Shade's Coverage for Stock at IPS Facility*

Shade's coverage as an additional insured related only to the commercial general liability coverage of Northbrook's policy and did not extend to first party coverage for property damage. The jury's special verdict, however, found that Shade was a third party beneficiary of the first party property insurance portion of the Northbrook policy. The record, which we have reviewed, clearly supports the finding. IPS secured first party coverage, at Shade's insistence, to cover its potential liability to Shade for almonds delivered to its plant for processing. Shade therefore possessed the right to bring an action against Northbrook. ■ "Civil Code section 1559 allows a direct action against an insurance company to enforce the terms of a contract which were intended to benefit the third party." (*Harper v. Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1087 [66 Cal.Rptr.2d 64].) It follows that, in recognition of Shade's rights as a third party beneficiary, the court properly rendered a joint judgment for $761,226.58 in favor of both IPS and Shade.

### C. *Recovery for Bad Faith*

The final judgment against Northbrook included an award to IPS of compensatory damages in the amount of $816,000 and an award to Shade of

$445,950.47 as attorney fees and expenses. These two portions of the judgment were both based on the jury's findings that Northbrook breached its covenant of good faith and fair dealing with respect to both liability and first party property insurance coverage in its dealings with IPS and Shade. The sum of $816,000 reflected the jury's findings of lost profits suffered by IPS as a result of Northbrook's breach. The amount of attorney fees and expenses incurred by Shade was set by the court in the final judgment.

### 1. Bad Faith Towards IPS

#### a. Factual Background

Shortly after learning of the General Mills complaint of contaminated almond clusters, Skip Petitt, president of IPS, wrote Northbrook a letter dated April 19, 1994, with a copy to his agent, Der Manouel, notifying the insurer in general terms of the possibility of a loss. Der Manouel followed up on this notification by faxing to the Northbrook claims department on May 2, 1994, a letter that independently notified the insurer of the loss. The letter included two relevant documents, Shade's preliminary breakdown of the elements of damage and a letter from Shade's president, Peter Stettler, describing the extent of the loss and attributing fault to IPS.

The Northbrook claim was handled by Linda Roundy, a claims adjuster in the insurer's Sacramento office. In response to Der Manouel's suggestion, she discussed the claim with Colleen Soukup, who handled Shade's business at General Mills, and with Todd Winslow, the secretary and co-owner of IPS. On May 13, 1994, she retained Frontier Adjusters, an independent firm of insurance adjusters in Kansas City, to conduct the aspects of the investigation involving Shade's manufacturing activity. The record reveals only that the firm sent a representative to visit the Shade plant, secured permission from Shade to examine a sample of the raw product supplied by IPS, and billed Northbrook $520 for its services. On May 18, 1994, Roundy made a personal visit to the IPS plant with a loss control engineer, Greg Correia. According to Petitt, the visit lasted less than one hour.

On June 1, 1994, Roundy wrote the other interested parties—IPS, Shade, Royal, General Mills and Der Manouel—to make a series of requests for additional information. She asked IPS to provide copies of its contract with Shade, invoices and shipping documents. According to Petitt, IPS gave Northbrook everything it asked for.

On June 2, 1994, while its investigation was in this preliminary stage, Northbrook referred the claim to outside counsel for a coverage opinion.

Roundy testified that she considered she already had enough information to enable counsel to make a correct determination.

By mid-June, Roundy became convinced that the company was "going to deny coverage" and, by her own admission, ceased investigating the claim. The claim file was closed on July 26, 1994. An internal record generated July 27, 1994, eliminated in its entirety an $800,000 reserve that had earlier been established for the claim.

On August 5, 1994, Roundy notified Petitt by letter that Northbrook would make no payment on the claim and that he would have to make his "own arrangements, at [his] own cost, for the defense and indemnity of this matter."[8] As a basis for denying coverage and defense of the claim, the letter reviewed the business-risk exclusions, the unavailability of coverage for claims "arising out of contract," and the definition of property damage. In addition, it suggested that IPS had intended, or had reason to expect, contamination by the wood splinters. The second paragraph begins: "Our investigation has uncovered that IPC [*sic*] during its processing operations allowed wood chips to infest almonds owned by Shade Foods." The fifth paragraph elaborates on this point: "To the extent that any IPS [*sic*] was aware of the wood chips and did nothing to alleviate the problem, coverage is excluded. The Northbrook policy excludes coverage for property damage expected or intended from the standpoint of the insured. Moreover, the public policy of the State of California precluded insurance coverage for acts which are intended by the insured."

The denial letter contained no reference at all to first party coverage under the Northbrook policy and did not distinguish between the elements of damages in a way that might have opened consideration of the portion of damages pertaining to this form of coverage. Roundy's supervisor, Anita Thibadeau, acknowledged that the claims department considered the claim only as a liability claim and did not open a first party claim file. The company's reserve related only to general liability coverage.

The letter closed with a conventional statement that the insured should "not hesitate" to bring "any additional information" or "additional materials" to Northbrook's attention. In a reply letter dated August 12, 1994, Petitt protested vigorously that Roundy had no factual basis for saying that IPS intended or expected the contamination to occur. He asserted, "For you or Northbrook to say with what little investigation you have done, that I.P.S. is solely responsible, is unforgiving [*sic*]."

---

[8]The letter was mistakenly dated July 5, 1994.

In a letter dated August 15, 1994, Der Manouel also took vigorous exception to the statement IPS "allowed" the wood splinter contamination to occur. He was chiefly concerned, however, with Northbrook's refusal to defend IPS in the event of litigation, stating that he was in "total disagreement" with this position. He added, "We need for Northbrook Insurance to stay in the loop on this claim. . . . I don't think that anything in this case has been conclusively proven so I would hope that dialogue, compromise, and reason would prevail in any of our future correspondence. [¶] . . . [¶] We do have a responsibility to our insured . . . . He has paid a lot of premium for protection; let's not abandon our responsibility to him."

So far as revealed by the record, Northbrook did not respond to the letters of either Petitt or Der Manouel or undertake any further investigation. On September 1, 1994, Roundy in fact informed its independent investigator, Frontier Adjusters, not to do any further work on the claim.

The interests of IPS, however, were implicated in correspondence between Northbrook and one of Shade's attorneys, John Hayob, who took issue with a very similar letter denying coverage to Shade. Hayob's letter dated August 31, 1994, raised the issue of first party coverage, a matter having importance to both Shade and IPS. The letter pointed out that the declarations of the commercial property coverage part of the policy extended coverage to "stock" with a separate limit of $3 million. This property insurance coverage, he argued, was "also available" to Shade.

Upon receiving Hayob's letter, the claims department supervisor, Thibadeau, consulted an employee in the company's underwriting department, but she did not contact Der Manouel to determine his understanding of property insurance coverage for almonds stored at the IPS plant. In a letter dated October 3, 1994, Thibadeau responded point by point to Hayob's letter. With respect to first party coverage for the damaged stock of almonds, she contended that the policy did not provide coverage for stock that was not owned by the insured; thus, since the almond stock was owned by Shade, it was not covered by the property insurance part of the policy. In addition, she contended that the claim came within exclusion 3 as a loss caused by faulty workmanship.

Another Shade attorney, Robert Phelps, presented a rebuttal to Thibadeau's denial of first party coverage in a letter dated November 23, 1994. The record does not reveal any further consideration of this form of coverage. Though Thibadeau replied to a telephone call of Petitt in January, Northbrook does not appear to have engaged in any other communications

with IPS until September 1995, or to have taken any initiative to apprise it of settlement negotiations with other parties.

In mid-1995, IPS was served with Shade's complaint in the present action. Petitt turned the matter over to Der Manouel, who tendered the defense to Northbrook. A Northbrook attorney, Michael Brady, refused the tender in a letter dated September 7, 1995, which cited the business-risk exclusions, noncoverage for contract claims, and the definition of "property damage," but again did not mention first party coverage. The letter concluded: "Northbrook sees no potentiality that this claim could be brought within the coverage provided by its policy."

IPS retained counsel at its own expense to defend the Shade action, but shortly before the originally scheduled trial date in June 1996, Northbrook reconsidered its decision to refuse IPS's defense. At that time, it offered to reimburse IPS for all attorney fees it had paid to date and to pay further legal expenses in the action. IPS accepted the offer of payment, and, accordingly, it did not pursue a claim for attorney fees in its cross-complaint against Northbrook.

b. *General Principles*

The covenant of good faith and fair dealing implied in every contract assumes peculiar importance in insurance law because it may support the recovery of a tort measure of damages. (*Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) In general, the standard of good faith and fairness calls for consideration of the reasonableness of the insurer's conduct in denying coverage.[9] As stated in *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 819 [210 Cal.Rptr. 211, 693 P.2d 796], " '[A]n erroneous interpretation of an insurance contract by an insurer does not necessarily make the insurer liable in tort for violating the covenant of good faith and fair dealing; to be liable in tort, the insurer's conduct must also have been *unreasonable*. . . .' [Citation.]" (See also *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1280-1281 [31 Cal.Rptr.2d 433]; *Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal.Rptr.2d 352]; *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54-55 [221 Cal.Rptr. 171].)

Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim. "[T]he covenant of good faith and

---

[9]An exception may be found in liability insurance cases in which the insurer refuses a settlement offer within policy limits on the ground the claim against the insured was not covered under its policy. In such cases, the insurer is held to act at its own risk. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 12:369 to 12:370, p. 12B-37.)

fair dealing implied in all insurance agreements entails a duty to investigate properly submitted claims . . . ." (*KPFF, Inc. v. California Union Ins. Co.* (1997) 56 Cal.App.4th 963, 973 [66 Cal.Rptr.2d 36]; *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 817 [169 Cal.Rptr. 691, 620 P.2d 141].) Though some authority tends to equate a bad faith failure to investigate with negligence, the better view appears to be that it must rise to the level of unfair dealing. (*Critz v. Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 12:384 to 12:387, 12:417 to 12:423, pp. 12B-41 to 12B-42, 12B-50 to 12B-52.)

An unreasonable failure to investigate amounting to such unfair dealing may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages. In *Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617 [50 Cal.Rptr.2d 224], the insurer denied payment on an accidental death policy, stating that the insured died of illness. While a hospital discharge summary appeared to support this position, other medical records and the testimony of the treating physician strongly indicated that the insured's death was due to an automobile accident. Affirming a finding of bad faith, the court stated, "An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing." (*Id.* at p. 1624.) Similarly, in *Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832, 846 [263 Cal.Rptr. 850], the insurer made no reasonable effort to obtain all medical records relevant to hospitalization of a mentally ill patient in reviewing the medical necessity of the hospitalization. Again, in *Betts v. Allstate Ins. Co.* (1984) 154 Cal.App.3d 688 [201 Cal.Rptr. 528], the insurer denied payment of a third party liability claim on the basis of the insured's self-serving account of an automobile accident, ignoring a mass of other available evidence indicating the insured's negligence.

The insurer's willingness to reconsider its denial of coverage and to continue an investigation into a claim has been held to weigh to favor of its good faith. (*Blake v. Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901, 922 [160 Cal.Rptr. 528].) In *Austero v. National Cas. Co.* (1978) 84 Cal.App.3d 1, 35 [148 Cal.Rptr. 653], reversed on other grounds in *Egan v. Mutual of Omaha, supra,* 24 Cal.3d at page 824, footnote 7, the court noted the insurer's "efforts to seek more information from several sources and *reconsider* plaintiff's claim at various times" and reversed a judgment of bad faith. This authority obviously supports the *converse proposition: the insurer's* early closure of an investigation and unwillingness to reconsider a denial when presented with evidence of factual errors will fortify a finding of bad faith.

A breach of the implied covenant may be predicated on the insurer's breach of its duty to defend the insured, though the insurer's conduct in such cases is commonly coupled with the breach of other aspects of the implied covenant, such as the duty to settle (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:620, p. 12B-96) or to investigate (*Tibbs v. Great American Ins. Co.* (9th Cir. 1985) 755 F.2d 1370, 1375). The broad scope of the insurer's duty to defend obliges it to accept the defense of "a suit which *potentially* seeks damages within the coverage of the policy . . . ." (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168]; *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) A breach of the duty to defend in itself constitutes only a breach of contract (*San Jose Prod. Credit v. Old Republic Life Ins.* (9th Cir. 1984) 723 F.2d 700, 703), but it may also violate the covenant of good faith and fair dealing where it involves unreasonable conduct or an action taken without proper cause. (*Amato v. Mercury Casualty Co.* (1997) 53 Cal.App.4th 825, 831 [61 Cal.Rptr.2d 909]; *California Shoppers, Inc. v. Royal Globe Ins. Co., supra,* 175 Cal.App.3d at p. 54.) On the other hand, "[i]f the insurer's refusal to defend is reasonable, no liability will result." (*Campbell v. Superior Court* (1996) 44 Cal.App.4th 1308, 1321 [52 Cal.Rptr.2d 385].)

The insurer's duty to defend must be determined on the basis of facts available to the insurer at the time the insured tenders the defense. "If the insurer is obliged to take up the defense of its insured, it must do so as soon as possible, both to protect the interests of the insured, and to limit its own exposure to loss. . . . [T]he duty to defend must be assessed at the outset of the case." (*CNA Casualty of California v. Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 605 [222 Cal.Rptr. 276].) It follows that a belated offer to pay the costs of defense may mitigate damages but will not cure the initial breach of duty.

c. *Analysis of the Evidence*

The record fully supports the finding of bad faith in Northbrook's denial of first party coverage. In light of the insurer's obligation to construe policy provisions broadly in favor of coverage, the policy language presented no serious obstacle to coverage—only exclusion 3 contained a genuine ambiguity—and the existence of coverage was revealed by the circumstances surrounding negotiation of the policy.

The jury could reasonably infer that Northbrook acted in bad faith by failing to investigate the relationship between IPS and Shade or to consult

Der Manouel, the general agent who issued the policy. IPS did not own the stock of almonds it processed for Shade, and the Northbrook policy was negotiated several years earlier for a related company, Classic Roasters, which also processed almonds it did not own. The $3 million of coverage for "stock" would be illusory if it did not apply to property of others for which IPS and Classic Roasters were legally liable.

A reasonable investigation would have revealed that the parties who negotiated the policy, Petitt on behalf of IPS and Der Manouel on behalf of Northbrook, understood that the property insurance coverage would extend to the stock of almonds delivered by Shade for processing at the plant. Der Manouel, who possessed authority as a registered agent to bind Northbrook, testified that he intended to extend coverage for the full value of the stock in IPS's possession at the plant, without regard to whether it was owned by IPS or a customer. He and Petitt wanted to protect "anybody's product that was on the [IPS] premises." The record shows that his amendment of the Classic Roaster's policy to include IPS as a named insured was in fact well calculated to provide such coverage.

In the absence of a meaningful investigation, Northbrook also had no evidentiary basis for its reliance on the "faulty workmanship" provision in exclusion 3. The claims supervisor, Thibadeau, could not articulate any factual theory for claiming the exclusion.

Northbrook's bad faith was further evident in its failure to respond to the letters of the insured and its own agent. In light of the authority conferred on him, Der Manouel's strongly worded letter disagreeing with the denial of coverage surely warranted serious consultation, if not reconsideration of the insurer's position. The record contains no evidence that Northbrook gave any consideration to Der Manouel's advice.

Similarly, the jury could infer that the insurer's negligent failure to open a file on first party coverage rose to the level of bad faith when it refused to adequately evaluate this form of coverage in response to the carefully reasoned letters of Hayob and Phelps. The record suggests that Northbrook looked the other way when confronted with facts revealing the possibility of first party coverage, resisting both reasonable interpretation of policy language and a compelling history of negotiation to secure this coverage.

■ The finding of Northbrook's bad faith in denying liability insurance coverage presents a closer issue. It is true that the existence of coverage was clouded by difficult issues regarding contractual liability and the definition of property damage. But despite these mitigating factors, the record reveals

that Northbrook rapidly closed the file on the IPS claim for liability coverage and thereafter declined to take any initiative in pursuing settlement negotiations, choosing instead to adopt a no-payment position from which it did not waiver. This consistent and inflexible position provides support for the jury's finding that Northbrook breached its implied covenant of good faith and fair dealing by a failure to properly investigate the claim and to defend IPS.

The record shows that Northbrook discontinued its investigation about a month after it began, without making any effective effort to determine the cause of the wood contamination. It made perfunctory visits of both the IPS and Shade plants and did not provide its loss control engineer with an opportunity for a meaningful investigation. On cross-examination at trial, the Northbrook claims adjuster, Roundy, was forced repeatedly to acknowledge her lack of any evidentiary basis for inferring how the accident occurred.

Northbrook's failure to develop a plausible theory of the cause of loss was especially damaging to its denial of coverage on the basis of particular exclusions. At trial, Roundy was unable to cite any evidence in support of factual assumptions underlying the company's reliance on the exclusion for impaired property and displayed confusion as to what came within the exclusion for "property you own, rent or occupy." Northbrook also had no evidentiary basis for the allegation in the denial letter that IPS intended or had reason to expect the contamination. On cross-examination, Roundy was able to say only that Shade made this allegation. Yet, when this allegation aroused strong protests from Petitt and Der Manouel, Northbrook did not reopen its investigation.

We see no reasonable basis for Northbrook's refusal to defend IPS. Our analysis of coverage issues reveals that, while the insurer could raise certain arguments against coverage, it could not reasonably maintain that there was no potential for coverage under the policy. Indeed, Northbrook's own assessment of the case initially called for reserves of $800,000. When Northbrook rejected the tender of the defense, IPS was forced to arrange and pay for its own defense. Northbrook did not fully remedy the harm caused by its refusal to defend by later paying IPS's attorney fees, though this belated decision unquestionably mitigated its damages.

We conclude that the record contains substantial evidence in support of the jury's finding that Northbrook breached the covenant of good faith and

fair dealing with respect to both first party coverage and liability coverage of IPS. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 920-922 [148 Cal.Rptr. 389, 582 P.2d 980].)

### 2. Northbrook's Bad Faith Toward Shade

#### a. Factual Background

The dealings between Northbrook and Shade in 1994 followed a closely parallel course to those between Northbrook and IPS. The brief investigation of the Northbrook claims adjuster in May and June 1994, had relevance to Shade's claim as well as that of IPS. Shade also cooperated fully with Northbrook's requests for information and permission to visit Shade's facilities, though it did ask Northbrook to execute a confidentiality agreement before providing certain requested information. The investigation ceased in mid-June with respect to both claims. Northbrook similarly denied Shade coverage and a defense in a letter dated August 5, 1994, which cited several justifications mentioned in the IPS letter—the business-risk exclusions, noncoverage for claims "arising out of contract," and the definition of "property damage"—and also relied on vendor's-endorsement exclusions 1(c), (d) and (e). These exclusions apply to products that are physically changed or repackaged by the vendor and to any failure of the vendor to make customary "inspections, adjustments, tests or servicing."

The letter dated August 31, 1994, of Shade's attorney, Hayob, which raised the issue of IPS's first party coverage, was directed largely at Shade's own rights as an additional insured. In her reply dated October 3, 1994, Thibadeau reaffirmed Northbrook's denial of coverage on this ground as well. Shade's president, Stettler, directed a lengthy and carefully drafted letter dated October 14, 1994, to the Northbrook claims adjuster, that rebutted Northbrook's denial of liability coverage. Thibadeau responded with a brief note dated October 20, 1994, stating that the company's position "remains unchanged." At trial, Thibadeau acknowledged that she never questioned Shade about the facts and had no recollection of any communication with Shade other than her letter to Stettler dated October 20, 1994.

But in 1995, we encounter a factual distinction between the two cases: Northbrook engaged in a series of negotiations with Shade's attorneys in the six-month period before this action was filed. Since Northbrook relies on settlement offers made during these negotiations as showing its good faith, we will review the record of the negotiations in detail.

All interested parties, except IPS, participated in a meeting in Kansas City on January 5, 1995, in an attempt to obtain a comprehensive settlement. The

participants included, Peter Stettler, president of Shade, Robert Phelps, counsel for Shade and Michael Brady, counsel for Northbrook. In uncontradicted testimony, Shade's president, Stettler, recounted that he opened the negotiations with a proposal for a comprehensive and definitive settlement. He related, "So I put the proposal on the table and said, we have a claim that's including interest and legal fees, about $3 million. So why don't we—I have a million dollars on the table from Royal. Why doesn't Northbrook pay a million dollars, and we take a million dollars, and the whole thing can be resolved?" The meeting subsequently broke into separate groups and ended in an impasse.

About a week later, Brady wrote Phelps a letter dated January 13, 1995, suggesting that Northbrook pay the sum of $670,000 to Shade as the basis for a settlement. He reasoned that Shade could not recover on the first party policy of IPS and that this sum represented about half of the General Mills claim, the other half being payable by Royal.

On March 29, 1995, Shade's counsel, Reginald Steer, made a settlement demand on Northbrook and Royal, which represented a variation on Stettler's offer at the January meeting: "Royal and Northbrook will agree to pay a total of $2 million in reimbursement to Shade. In exchange, Shade will cooperate, as a non-party in any adjudicatory proceeding that Royal and Northbrook choose to determine their proportional share of responsibility for that sum; also, although Shade's loss exceeds $3 million, Shade will forego any claim for reimbursement in excess of $2 million and Shade will also forego ex-contract claims against its insurers."

Brady tentatively accepted the proposal as a basis for further negotiations. In a letter dated April 10, 1995, he stated, "[W]e are presently inclined to agree that this could constitute a good framework for resolution of the case." He noted, however, that the settlement proposal was "conditioned on both carriers' consent." Upon receiving Brady's letter, Phelps wrote to his client that "Northbrook has accepted our proposal."

On June 2, 1995, Shade's counsel wrote Brady that a complaint had been filed and gave Northbrook 15 days to accept its proposal of March 29, 1995. In a letter dated June 14, 1995, Brady replied that he had earlier indicated a willingness to accept Shade's settlement demand and hoped to meet with him to discuss it further. In response to the March 29 proposal, he repeated Northbrook's offer to pay $1 million, but added several conditions. In exchange for the payment, Northbrook would expect the following: (1) a release from General Mills, (2) a release of IPS by Shade, (3) a reservation

of rights, and (4) a release from Shade running in favor of Northbrook with respect to any first party claims. The letter broadly described the required reservation of rights: "The payment of $1 million in cash would be under a reservation of rights, namely, Northbrook's continued insistence that its policy provides no coverage whatsoever for this claim. The payment would also be made on the express understanding that Northbrook is reserving its rights to seek reimbursement from Shade for that amount once the General Mills claim is settled."

According to Brady, Northbrook continued to offer $1 million as settlement throughout the litigation but it feared that, without adequate precautions, it could be brought back into the litigation by Royal. Nevertheless, in mid-1996, Northbrook offered to pay $1 million as settlement "without any kind of strings" attached.

b. *Analysis*

The sufficiency of the evidence to support the jury's finding that Northbrook acted in bad faith by denying liability insurance coverage to Shade presents the same issue relating to its duty to investigate claims that we have discussed earlier in connection with Northbrook's denial of liability coverage to IPS. As in the case of the IPS claim, Northbrook failed to conduct a meaningful investigation before denying coverage and declined to reopen the inquiry upon receiving well-reasoned objections in the letters of Hayob and Stettler, dated August 31, 1994, and October 14, 1994, respectively. Such an egregious failure to conduct a proper investigation similarly supports a finding of bad faith. We do not think that Northbrook strengthened its grounds for denying coverage by citing the exclusions in the vendor's endorsement. Its reading of exclusions 1(c) and (d) relating to reprocessing and repackaging of the product would have rendered the coverage of the vendor's endorsement entirely illusory, and it failed to adduce any evidence indicating that Shade was at fault within the terms of exclusion 1(e).

Northbrook argues, however, that it absolved itself from any inflexibility in denying the claim in 1994 by negotiating in good faith in 1995. The record unquestionably reveals that Northbrook responded in a constructive manner to Shade's settlement initiatives in Brady's letters of January 13, 1995, and April 10, 1995. But Shade claims that these auspicious responses led only to a hardened position expressed in Brady's letter of June 14, 1995, which attached unreasonable conditions to settlement. For its part, Northbrook construes this letter as accepting Shade's settlement offer of June 2, 1995.

The issue thus leads to the reasonableness of the conditions for settlement set forth in Brady's letter of June 14, 1995. The conditions attached to Northbrook's purported acceptance can support a finding of liability in tort for violating the covenant of good faith and fair dealing only if the conditions were unreasonable. (*Brandt v. Superior Court, supra,* 37 Cal.3d at p. 819.) We will now turn to each of the four conditions. It is, of course, elementary that Northbrook properly requested a release from the injured party, General Mills. A unilateral payment without such a release would not constitute a settlement of the claim and might in fact bankroll continued litigation. (*State Farm Mut. Auto. Ins. Co. v. Crane* (1990) 217 Cal.App.3d 1127, 1136 [266 Cal.Rptr. 422]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 12:303, p. 12B-22.) It is also clear that Northbrook properly requested Shade's release of IPS, a co-insured under the commercial general liability policy. ■■■ "[A]n insurer may, within the boundaries of good faith, reject a settlement offer that does not include a complete release of all of its insureds." (*Strauss v. Farmers Ins. Exchange* (1994) 26 Cal.App.4th 1017, 1021 [31 Cal.Rptr.2d 811].)

■■■ The further condition that Northbrook would reserve its right to seek reimbursement from Shade after resolution of coverage issues is authorized in principle by *Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744], which states, "[A]n insurer in defendant's position retains the ability to enter an agreement with the insured reserving its right to assert a defense of noncoverage even if it accepts a settlement offer. If, having reserved such rights and having accepted a reasonable offer, the insurer subsequently establishes the noncoverage of its policy, it would be free to seek reimbursement of the settlement payment from its insured." Nevertheless, since the condition serves to deprive a settlement of desired finality, we consider that it may be unreasonable under particular circumstances, at least if not circumscribed by a more detailed agreement. In the present case, we consider Northbrook acted properly in putting the proposal on the table for further negotiation, though the broad and emphatic language of Brady's letter might have caused a jury to question whether Northbrook actually intended the condition to be negotiable.

■■■ The fourth condition, however, we consider to be clearly unreasonable: Northbrook could not reasonably condition a settlement of its liability insurance obligation on the insured's abandonment of its right to reimbursement as a third party beneficiary of the first party coverage. As we have seen, Shade's position as a third party beneficiary of Northbrook's first party coverage of IPS was strongly supported by the policy language, the

circumstances surrounding negotiation of the policy, and the understanding of its own agent, Der Manouel. By insisting that Shade abandon its rights as a third party beneficiary, Northbrook continued to pursue a consistent position in refusing to acknowledge its obligations for first party coverage.

■ Ordinarily, the question whether the insurer has acted unreasonably in responding to a settlement offer is a question of fact to be determined by the jury. (*Walbrook Ins. Co. v. Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1454 [7 Cal.Rptr.2d 513].) As stated in *Davy v. Public National Ins. Co.* (1960) 181 Cal.App.2d 387, 397 [5 Cal.Rptr. 488], "[a] determination respecting the presence or absence of good faith involves an inquiry into motive, intent and state of mind. Conclusions concerning such matters, in most cases, are founded upon inferences." ■ We conclude that the jury could reasonably infer that Northbrook's inflexible refusal to accept or consider its obligations for first party coverage injected a decisive element of bad faith into its dealings with respect to liability insurance coverage. By conditioning a settlement of its liability insurance obligation on waiver of first party coverage, Northbrook linked its liability insurance obligation to the same unreasonable position that it had taken with respect to first party coverage.

Our affirmance of the jury's finding that Northbrook breached the implied covenant of good faith toward Shade necessarily leads to an affirmance of the court's award to Shade of $445,950.47 in attorney fees and costs.

### 3. *Damages for Lost Profits of IPS*

■ Northbrook next challenges the award of damages to IPS in the amount of $813,394 for lost profits. It does not dispute that an insured may recover lost profits proximately caused by the insurer's bad faith conduct (*Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 580 [108 Cal.Rptr. 480, 510 P.2d 1032]), but it argues that the evidence does not support a finding that Northbrook's conduct caused IPS's loss and that the calculation of future earnings was too speculative to constitute a basis for computation of damages.

With regard to cause, Northbrook argues that Shade decided to terminate its relationship with IPS because of dissatisfaction with its quality standards and made this decision before it learned of Northbrook's denial of coverage. Stettler drafted a letter terminating the contract between Shade and IPS on June 30, 1994, before going on vacation and mailed the letter on August 1, 1994. The letter denying coverage was received on August 5, 1994. Shade ultimately reached an agreement to lease the IPS plant on August 26, 1994.

At trial, Petitt presented a different account. Throughout August, IPS was engaged in intense negotiations with Shade. The letter formally terminating the existing contract was something Stettler "legally had to do," but it did not suspend relations between the companies. He replied to the letter and scheduled a meeting on August 5, 1994, at which they discussed various options for restructuring their relationship. At this time, he considered that he had the option of walking away from the Shade business and selling to other food processors. The plant was "up and running" and capable of producing a quality product. His co-owner, Todd Winslow, similarly affirmed that the company was on the verge of securing a number of other accounts.

According to Petitt, it was the existence of the unresolved claim with Shade that forced him to abandon other options. He could not hope to pursue other business relationships with "the lawsuit staring us in the face and the insurance company abandoning us." He had no choice but to accept the extremely disadvantageous terms dictated by Shade. Winslow expressed doubts that IPS could have secured other insurance to stay in business with the existence of the pending claim.

The evidence relating to the calculation of lost profits was presented by Todd Winslow, who performed accounting work for IPS. Winslow reported the income and expenses of the company for the first three months of the year and projected a probable profit of about $500,000 for the first year of the contract term and a 10 percent growth rate for the second and third years. From the projected profit, he deducted lease payments by Shade in the amount of $228,000 in each of the three years and arrived at a total of $971,000 in lost profits. For his part, Petitt verified the income and expense statement for the first three months of 1994 and described his experience in the nut processing business and the availability of other potential customers besides Shade.

On this record, the issue of causation is subject to the familiar standard of appellate review. As a court of review, we indulge in every reasonable inference to uphold the verdict if possible and defer to the jury's assessment of the credibility of the witnesses. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 359, p. 408.) "[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

In reviewing the amount of the award of damages, we are governed by the principle that "[l]ost profits to an established business may be

recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision." (*Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 161 [190 Cal.Rptr. 815].) The extent of such damages may be measured by "the past volume of business and other provable data relevant to the probable future sales." (*Grupe v. Glick* (1945) 26 Cal.2d 680, 692 [160 P.2d 832].) For this reason, the determination of lost profits of a new business presents problems of proof. "It has been frequently stated that if a business is new, it is improper to award damages for loss of profits because absence of income and expense experience renders anticipated profits too speculative to meet the legal standard of reasonable certainty . . . . However, the rule is not a hard and fast one . . . ." (*Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221 [92 Cal.Rptr. 111]; *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1698 [42 Cal.Rptr.2d 136].)

▮▮▮ We conclude that the jury could reasonably accept the credibility of Petitt and Winslow and infer from their testimony that IPS was forced out of business by Northbrook's denial of coverage. Again, accepting their testimony, the jury could infer that, in light of the availability of other potential business, the company's income and expense statement for the first three months of 1994 provided a reasonable basis for projecting lost profits over the remainder of the three-year contract term.

### D. *Recovery of Punitive Damages*

#### 1. *General Principles*

Our affirmance of the findings of Northbrook's bad faith toward IPS and Shade does not necessarily call for a similar affirmance of the judgments for $2 million and $3 million in punitive damages in favor of IPS and Shade, respectively. (*Silberg v. California Life Ins. Co.* (1974) 11 Cal.3d 452, 462-463 [113 Cal.Rptr. 711, 521 P.2d 1103].) ▮▮▮ The same evidence is relevant both to the finding of bad faith and the imposition of punitive damages, but "[t]he conduct required to award punitive damages for the tortious breach of contract . . . is of a different dimension [than that required to find bad faith]." (*Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1286.) Moreover, the evidence in support of the award of punitive damages must satisfy a distinct and far more stringent standard.

Civil Code section 3294, subdivision (a), authorizes recovery of punitive damages in a tort action on the basis of findings "that the defendant has been

guilty of oppression, fraud, or malice . . . ." As in most insurance cases, punitive damages here can be most plausibly justified by a finding of oppression or malice. As used in subdivision (a), "oppression" is defined to mean "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c).) "Malice" is defined to mean inter alia "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (*Ibid.*) As interpreted in *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725 [34 Cal.Rptr.2d 898, 882 P.2d 894], the requirement of "despicable" conduct represents a "substantive limitation on punitive damage awards. Used in its ordinary sense, the adjective 'despicable' is a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.' [Citation.]"

In addition, Civil Code section 3294, subdivision (a), requires proof "by clear and convincing evidence" that the defendant is guilty of oppression, fraud, or malice. *In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198], provides an authoritative explanation of the clear and convincing evidence standard: " '[c]lear and convincing' evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' [Citation.] It retains validity today."

In this appeal, the jury award of punitive damages must be upheld if it is supported by substantial evidence. (*Nat. Auto. & Cas. Co. v. Ind. Acc. Com.* (1949) 34 Cal.2d 20, 25 [206 P.2d 841]; *Patrick v. Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1576 [267 Cal.Rptr. 24].) As in other cases involving the issue of substantial evidence, we are bound to "consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference*, and *resolving conflicts* in support of the judgment." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 359, p. 408.) But since the jury's findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden. In other words, we must inquire whether the record contains "substantial evidence to support a determination by clear and convincing evidence . . . ." (*Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1287.)

In *Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468 [21 Cal.Rptr.2d 338], the court set out a careful discussion of the standard of review of adjudications of punitive damage claims. Reviewing a judgment

for nonsuit on a claim of punitive damages, the court explained, "If a plaintiff is to recover on such a claim [of punitive damages], it will be necessary that the evidence presented meet this higher evidentiary standard. As the United States Supreme Court put it, in the context of ruling on a motion for summary judgment, 'the judge must view the evidence presented through the prism of the substantive [clear and convincing] evidentiary burden . . . .' . . . [¶] We see no reason why this standard should not apply here. . . . Thus, the trial court properly viewed the evidence presented by [plaintiff] with that higher burden in mind. In our review of the trial court's order granting the nonsuit, we can do no differently." (*Id.* at p. 482, citations and fn. omitted.)

### 2. *Punitive Damages in Favor of IPS*

 The record reveals that, when initially presented with the claim, Northbrook unreasonably failed to assess first party coverage and greatly overestimated the strength of its defenses to the point of concluding that there was no potential for coverage. In the course of the negotiations following its denial of coverage, it never took any meaningful action to reassess its ill-advised denial of first party coverage; and after the complaint was filed, it waited a full year to offer to pay the defense costs of IPS. Underlying Northbrook's conduct, the jury could reasonably perceive a careless disregard for the rights of its insured and an obstinate persistence in an ill-advised initial position. We think that this conduct might conceivably support a finding that the insurer acted "with a willful and conscious disregard of the rights . . . of others" within the definition of "malice" or that the insurer "subject[ed] a person [IPS] to cruel and unjust hardship in conscious disregard of that person's rights" within the definition of "oppression." (Civ. Code, § 3294, subd. (c).) But we still must take into account the extreme complexity of the coverage issues and the purely economic character of the losses in assessing the level of opprobrium that it merits. In our opinion, the record falls well short of establishing by clear and convincing evidence the sort of contemptible conduct that could be described by the term "despicable." Unreasonable and negligent as it may have been, Northbrook's conduct falls within the common experience of human affairs, both with respect to its careless initial evaluation and its stubborn persistence in error.

Though "[d]eterminations related to assessment of punitive damages have traditionally been left to the discretion of the jury" (*Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 821), our analysis of the record convinces us that the jury possessed no reasonable basis for awarding IPS punitive damages of $2 million against Northbrook.

### 3. *Punitive Damages in Favor of Shade*

A record that presents a close case with regard to the sufficiency of the evidence of bad faith will inevitably provide a tenuous basis for supporting an award of punitive damages, since both the bad faith and punitive damage findings rest on inferences to be drawn from the same evidence. Though we have concluded that the record supports the finding of Northbrook's bad faith conduct toward Shade, the issue was extremely close. We are unwilling to take the further step of upholding the jury's finding that Northbrook acted with malice or oppression toward Shade. The record shows that Northbrook persisted in an unreasonable denial of first party coverage to the point of conditioning a settlement of the General Mills claim on Shade's waiver of its third party beneficiary rights to this first party coverage. This conduct may have been unreasonable to the point of constituting a form of unfair dealing, but we do not think the jury could reasonably find that it constituted clear and convincing evidence of "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights" or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c).)

### E. *Inconsistency of the Verdict*

Lastly, Northbrook complains that the special verdict in phase I of the trial was fatally inconsistent. (*Cavallaro v. Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 100-106 [157 Cal.Rptr. 602].) The jury was instructed that "The total combined fault of all parties who contributed to the loss claimed by General Mills, including any fault on the part of General Mills must be considered by you in arriving at your allocation of fault whether or not a claim was made by General Mills against that party." In response to questions 1 through 3, the jury found that Shade breached an implied warranty to General Mills and that this breach caused damages of $1,347,932.20. Question 4 asked what percentage of the damage could be attributed to the fault of General Mills, Shade and IPS. The jury answered this question, which appears to relate only to the breach of warranty claim in the only way it could: it found that Shade was 100 percent responsible for General Mills' damages, since General Mills had not breached a warranty to Shade and the preceding questions had nothing to do with any breach of warranty to General Mills by IPS. In response to the very next question, however, the jury found that IPS was negligent, and it later found that IPS breached an express and implied warranty to Shade. In response to related questions, the jury found that IPS's negligence and breach of warranty was a cause of

damage to Shade in the amount of $2,146,640.60—a figure that included the economic injury to General Mills.

Northbrook now argues that the jury's findings in response to question 4 to the effect that IPS was not responsible for the economic injury of $1.3 million to General Mills is inconsistent with later findings that it was responsible for this economic injury on the basis of negligence and breach of warranty. But the argument ignores the narrow context of question 4. We think the jury construed it as referring to the breach of warranty involved in the previous three questions. Though this reference was meaningless—Shade alone could be responsible for its own breach of warranty—the question had no other apparent reference. The jury clearly did not intend to absolve IPS of . liability because it found that IPS was negligent in response to the next question in the verdict form. The verdict in effect allocated fault and responsibility for the loss to IPS, the party whose negligence caused the breach of contract and implied warranty to Shade, which in turn led to Shade's breach of warranty to General Mills.

We conclude that the trial court properly exercised its power to construe the verdict in accordance with the pleadings, evidence, and instructions. (*Tri-Delta Engineering, Inc. v. Insurance Co. of North America* (1978) 80 Cal.App.3d 752, 758 [146 Cal.Rptr. 14]; *Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 375 [62 Cal.Rptr. 379].)

II. *Judgment Against Royal*

A. *Coverage Issues*

The judgment allowed Shade to recover damages from Royal in the amount of $1,054,419.50 for liability insurance coverage applying to its $1.3 million settlement with General Mills. The precise amount of the damages was based on a stipulation of the parties that certain payments included in the settlement were not covered by Royal's policy. Royal now attacks this portion of the judgment on two grounds: (1) the insuring clause of its policy does not cover contract damages, and (2) its obligation to pay for the General Mills claims was limited by the other-insurance clause in the policy.[10]

1. *Insuring Clause*

■■■ The insuring clause of the Royal policy contains the same standard language that we have reviewed in connection with Northbrook's coverage:

---

[10]In its reply brief, Royal raises for the first time the contention that the trial court erred in refusing to apply exclusion 2(k) to reduce its coverage obligation. We decline to consider the

"We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The special verdict found that Shade was not negligent but breached an implied warranty to General Mills. While California law applies to interpretation of the insuring clause (*Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.* (1993) 14 Cal.App.4th 637, 646-648 [17 Cal.Rptr.2d 713]), the breach of implied warranty implicates legal obligations under Minnesota law. Shade sold goods to General Mills under a purchase agreement providing that the contract between the parties would be governed by Minnesota law, and the parties stipulated at trial that Minnesota law governed Shade's liability to General Mills.

Our analysis of the Northbrook policy applies fully to the interpretation of the Royal insuring clause. Again, *Vandenberg v. Superior Court, supra,* 21 Cal.4th 815 is dispositive. We construe the "legally obligated to pay" language as referring to any obligation that is "binding and enforceable under the law." (*Id.* at p. 840.) The breach of implied warranty under Minnesota law unquestionably imposed binding and enforceable obligations on Shade.

We would, moreover, reach the same conclusion on pre-*Vandenberg* law. The warranty of merchantability under Minnesota law gives rise to a unique form of statutory liability, distinct from contract or tort liability; it imposes liability without regard to privity of contract, applies without reference to any contractual provision, cannot be excluded or limited by contract, and permits recovery of damages for personal injury and property damage as well as economic losses, subject to rules governing standing to sue based on judicial interpretation of legislative intent. (Minn. Stat. §§ 336.2-318, 336.1-201(28) and (30), 336.2-314; *Minnesota Mining and Mfg. v. Nishika Ltd.* (Minn. 1997) 565 N.W.2d 16, 21.) Even before the *Vandenberg* decision, the California Supreme Court implicitly held in *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d 807 that a statutory liability came within coverage of the "legally obligated to pay" language.[11]

---

issue here in deference to the rule that " 'points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. . . .' " (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788], citations omitted; see also 9 Witkin, Cal. Procedure (1999 supp.) Appeal, § 616, p. 82.)

[11]Royal construes a remark of Shade's counsel as a stipulation that the breach of implied warranty was outside the coverage of the insuring agreement because it is based on contract under Minnesota law. But as we read the record, we understand counsel as making a minor and entirely accurate clarification. Since the implied warranty creates an "obligation imposed

## 2. Other-Insurance Clause

Royal also argues that its obligation to pay for the General Mills claim was limited by the other-insurance clauses contained in its own liability insurance policy and Northbrook's policy. Both policies contained a standard "pro rata" clause. (See *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 599 [178 Cal.Rptr. 908].) The portions of the clause relevant to the present case provide: "If other valid and collectible insurance is available to the insured for a loss we cover . . . , our obligations are limited as follows: [¶] a. This insurance is primary [with exceptions not pertinent here]. . . . Our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below. [¶] . . . [¶] c. . . . If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first."

Since the other-insurance clauses in both policies permit contributions by equal shares if the other insurance permits this method, it is evident that Royal's policy calls for this method of contribution in satisfying its indemnity obligation.[12] Nevertheless, Royal and Shade construe the clause in sharply differing ways with respect to (1) Royal's good faith obligation to settle the General Mills claims and (2) the appropriate form of the judgment enforcing the indemnity obligation of Royal and Northbrook. While we have not discovered other decisions dealing with the precise factual context presented by this appeal, we find guidance in recent decisions dealing with a closely analogous situation—the allocation of a continuing loss among successive insurers.

In *Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th 645 (*Montrose*), our high court considered the circumstances triggering coverage under the standard provisions of a general liability insurance policy for bodily injury and property damage that is continuous or progressively deteriorating throughout several policy periods. The insured, Montrose Chemical Corp., was sued for damage caused by leakage from dump sites where it had deposited toxic by-products of the production of DDT. Admiral

---

by law" within the meaning of the insuring clause, it "is like a tort for insurance coverage purposes," but it may still "sound in contract" for other purposes.

[12]See *CSE Ins. Group v. Northbrook Property & Casualty Co.* (1994) 23 Cal.App.4th 1839, 1846 [29 Cal.Rptr.2d 120] ("If the CSE other-insurance clause were identical to the Northbrook clause, under settled law the two policies would prorate.").

Insurance Company insured Montrose after it had ceased production of DDT but while the leakage was continuing. Holding that Admiral was obligated to defend Montrose, the court adopted the theory of "continuous injury" as a trigger of coverage under which "bodily injuries and property damage that are continuous or progressively deteriorating throughout successive policy periods are covered by all policies in effect during those periods." (*Id.* at p. 675.)

Apart from its holding, the *Montrose* opinion contains dicta that has shaped subsequent Court of Appeal decisions. First, it appeared to say that each insurer sharing coverage with other successive insurers is individually liable for the full amount of the loss up to its policy limits. Thus, it relied on a Washington decision, *Gruol Construction Co. v. Insurance Co. of No. Amer.* (1974) 11 Wn.App. 632 [524 P.2d 427], holding that "[a]n insurer would become liable at any point in the process for the entire loss up to the policy limits, even though the continuing injury or progressively deteriorating damage may extend over several policy periods." (*Montrose, supra,* 10 Cal.4th at p. 678; see also pp. 665, 681, 686-687.)

Second, *Montrose* specifically disapproved the holding of *California Union Ins. Co. v. Landmark Ins. Co.* (1983) 145 Cal.App.3d 462, 478 [193 Cal.Rptr. 461], to the effect that successive insurers sharing coverage of a loss would incur joint and several liability: "We do not endorse that aspect of the *California Union* court's holding that both insurers in that case were *jointly and severally liable* for the full amount of damage occurring during the successive policy period. [Citation.] Allocation of the cost of indemnification once several insurers have been found liable to indemnify the insured for all or some portion of a continuing injury or progressively deteriorating property damage requires application of principles of contract law to the express terms and limitations of the various policies of insurance on the risk." (*Montrose, supra,* 10 Cal.4th at p. 681, fn. 19.)

Shortly after *Montrose,* in *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., supra,* 45 Cal.App.4th 1, this court considered the liability of successive insurers for bodily injury caused by asbestos contamination. We approved the trial court's conclusion that "each policy triggered by an asbestos-related bodily injury claim has an independent obligation to respond 'in full' to a claim," (*id.* at p. 49) and quoted a federal case stating that " '. . . the primary duty of the insurers whose coverage is triggered by exposure or manifestation is to ensure that Keene [the insured] is indemnified in full.' " (*Id.* at p. 51, citing *Keene Corp. v. Ins. Co. of North America*

(D.C. Cir. 1981) 667 F.2d 1034, 1050 [215 App.D.C. 156], cert. den. (1982) 455 U.S. 1007 [71 L.Ed.2d 875, 102 S.Ct. 1644].) At the same time, we affirmed the trial court's order apportioning liability among all the liability insurers whose policies covered the asbestos-related injury. Following *Montrose,* we rejected joint and several liability among the successive insurers and noted that " '. . . the "other insurance" provisions of each policy provide a scheme by which the insurers' liability is to be apportioned. . . .' " (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., supra,* at p. 51, again citing *Keene.*)

The decision in *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810 [54 Cal.Rptr.2d 176] concerned the liability of successive insurers for erosion damage caused by the faulty construction of a municipal drainage system. The City of Palos Verdes Estates paid a claimant the sum of $350,000 as part of a settlement and then sued its liability insurers to recover this amount. The trial court held that two insurers, Jefferson and Admiral, were jointly and severally liable for $297,000, a sum equal to the $350,000 payment less a deductible of $3,000 and a self-insurance retention of $50,000. Treating the case as involving successive insurers for a loss continuing throughout their respective policy periods, the court found error only in the imposition of joint and several liability.

The *Stonewall* court begins with the premise: "With one important qualification, all primary carriers on the risk are liable to the City (up to the limits of their respective policies, less any applicable deductibles or retentions) for the full $350,000." (*Stonewall Ins. Co. v. City of Palos Verdes Estates, supra,* 46 Cal.App.4th at p. 1855, italics omitted.) The qualification was based on the criticism of joint and several liability of successive insurers in the *Montrose* decision. The error in imposing such liability, according to the court, is that it fails "to take 'the express terms and limitations' of the policies into account." (*Stonewall Ins. Co. v. City of Palos Verdes Estates, supra,* at p. 1856.) Such express terms and limitations relate "not only to any deductible and retention provisions of the policies but also to any 'other insurance' clauses in the policies." (*Ibid.*)

The record on appeal in *Stonewall* revealed that the policies of both insurers contained other-insurance clauses but the application of these clauses had not been briefed. Remanding the case to the trial court, the court directed that the lower court fashion a pro rata formula of liability to the insured whereby neither insurer would be held liable for all the loss: "the $297,000 portion of its payout to [the claimant] remaining after deducting the $3,000 in Jefferson deductibles and the $50,000 Admiral retention

should be imposed partly upon Jefferson severally and partly upon Admiral severally." (*Stonewall Ins. Co. v. City of Palos Verdes Estates, supra,* 46 Cal.App.4th at p. 1857.)

The first principle appearing in the *Montrose* dicta and repeated in *Armstrong* and *Stonewall*—that each successive insurer is liable in full for the loss up to its policy limits—has direct relevance to Royal's duty to settle in compliance with the implied covenant of good faith and fair dealing. The principle implies that Royal was bound by an obligation to indemnify Shade for the whole amount of the loss, without taking into account any contribution that Northbrook might be obligated to make. As stated in a still more recent decision, "where there are multiple primary liability insurance policies covering the same risk each insurance carrier has an independent obligation to indemnify . . . ." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1297 [77 Cal.Rptr.2d 296].) The insurer's independent obligation to indemnify its insured who has primary coverage with other insurers does not require the insurer who pays a settlement to solely bear the burden of the loss. An action for equitable indemnity or contribution then exists against the other insurers. (*Id.* at p. 1289.) The allocation of the loss would then be governed by the terms of their respective policies including any other-insurance clauses.

The principle that each concurrent insurer is fully liable for the loss up to its policy limits must be reconciled with the second principle appearing in the *Montrose/Armstrong/ Stonewall* line of authority—that the final judgment should allocate liability severally among the insurers in accordance with the other-insurance clause. But it should be noted that in *Armstrong* we affirmed a judgment that was not described in detail and the *Stonewall* court left the trial court to fashion an appropriate judgment. The judgment can be crafted to allow for a contingent liability of each insurer for the full amount of the loss up to policy limits. By its terms, the other-insurance clause comes into play only if "other valid and collectible insurance is available to the insured." The allocation of liability to individual insurers may be conditioned on the existence of a collectible obligation with respect to each of the insurers affected. If the judgment enforcing the indemnity obligation of the other insurance proves to be uncollectible due to bankruptcy or other reason, the allocation should not apply and each insurer should be liable for the full amount of the loss up to policy limits. This refinement in the judgment will be a matter of no consequence where the insurers all possess unquestioned credit. But if requested by a party, the judgment may provide that the trial court will reserve jurisdiction to modify the judgment so as to impose liability on each insurer up to policy limits upon a showing

that the portion of judgment allocating liability to other insurers is uncollectible.

The record here reveals that the trial court erred in imposing joint and several liability on Northbrook and Royal to indemnify Shade for the payment of $1,347,932.20 in settlement of the General Mills claim. Northbrook was ordered to pay the policy limits of $1 million; Royal was ordered to pay $1,054,419.50. The effect was to confer on Shade a right of double recovery for its settlement payment in the amount of $706,487.[13] In fashioning the judgment in this manner, the court failed to comply with the principle, mostly clearly articulated in *Stonewall*, that "[t]he trial court shall allocate among the carriers themselves the burden of the loss . . . ." (*Stonewall Ins. Co. v. City of Palos Verdes Estates, supra,* 46 Cal.App.4th at p. 1826.)

Our conclusion that the judgment should allocate liability equally between Northbrook and Royal for coverage of the General Mills settlement leads to a further dilemma: should the allocation be based on the full amount of the settlement (i.e., $1,347,932.20) even though the parties have stipulated that Royal provided coverage for a lesser amount (i.e., $1,054,419.50)? We conclude that the judgment should reflect equal allocation of the full amount of the settlement so as to impose on each insurer a liability of $673,966.10.[14] Such an allocation is consistent with the plain language of the other-insurance clause, and it will not result in payment of an uninsured loss. We note that Northbrook waived the objection that certain specific items of the settlement were not covered by its policy by insisting that no damages were covered.[15]

Accordingly, we reverse the portion of the judgment against Royal indemnifying Shade for the General Mills claim in the amount of $1,054,419.50

---

[13]If we consider all damages for negligence and breach of warranty and recovery under both first party and liability coverage, the judgment reflects overcompensation of Shade in the amount of $669,005.48 ($1,054,419.50 [Royal indemnity] + $1,761,226.58 [Northbrook indemnity] = $2,815,646.08; $2,815,646.08 – $2,146,640.60 [jury's finding of Shade's actual damages] = $669,005.48.)

[14]The division by equal shares should not take into account first party coverage since the other-insurance clauses relate solely to liability insurance coverage. We see no merit in Royal's contention that there should be a deduction from the third party loss for "that portion of the GMI claim which represented the contaminated almond stock, which the court concluded was covered under Northbrook's more specific first party coverage." The portion of Northbrook's policy providing first party coverage specifically provides that this coverage is excess to "other insurance covering the same loss or damage."

[15]In the order regarding Northbrook's coverage, the trial court found: "It was Northbrook's burden to show the applicability of the exclusions upon which it relies, and to point out the specific damages claimed by General Mills against Shade and by Shade against IPS that fell within the specific language of those exclusions. Northbrook has largely failed to address the various elements of damages asserted by the claimants, but has instead insisted that all

(and the portion of the judgment against Northbrook jointly indemnifying Shade and IPS in the amount of $1 million) and remand the case to the trial court for an appropriate modification of these portions of the judgment in compliance with the other-insurance clauses of the insurers' policies.

### B. *Royal's Bad Faith Liability*

The special verdict found that Royal breached the implied covenant of good faith and fair dealing toward Shade in denying payment under its general liability insurance policy. On the basis of this finding, the trial court awarded Shade $447,637.28 as compensatory damages for attorney fees and costs pursuant to *Brandt v. Superior Court, supra,* 37 Cal.3d at page 819.

#### 1. *Factual Background*

As Shade's liability insurance carrier, Royal was notified of the contamination incident in late April and received an estimate that the unusable product in General Mills' warehouse represented a loss of $1,348,211. Royal immediately appointed a Kansas City attorney, John Hayob, to represent Shade and assigned a senior claims adjuster, James Parr, to the case. Parr kept up a correspondence with Shade throughout the year but worked increasingly with the carrier's own outside counsel, Richard Angell. Reflecting the importance of the claim, Shade's president, Peter Stettler, personally assumed responsibility for negotiations with General Mills and the company's insurers.

From the outset, Stettler made clear to Royal that Shade wanted to resolve the contamination claim as soon as possible and intended to assume full responsibility for General Mills' losses. According to Stettler, Parr repeatedly assured him that Shade had coverage under the Royal policy and Royal would "stand behind" Shade in settling the General Mills claim. Stettler thought he received written confirmation of Royal's support in a 23-page, single-spaced coverage letter dated October 12, 1994, drafted by Royal's attorney, Richard Angell.

The coverage letter included a two-and–one-half-page analysis of the elements of loss, clearly attesting to Royal's careful investigation of the claim, and an extensive discussion of coverage under both the Royal and Northbrook policies. The letter summarized Royal's liability coverage by stating that its "policy provides coverage to Shade for the portions of the

damages are excluded, even where the language of the exclusions plainly does not apply to certain specific elements of the damages."

claim presented by GMI for the physical injuries to its cereal identified in subparagraphs I:C:1:b., c. & d . . . ." Subparagraph b. referred to damaged cereal representing a loss of $1 million; the other two subparagraphs referred to minor losses of $10,000 and $5,500. The discussion of Royal's coverage concluded by noting that other liability insurance was also available to Shade in the Northbrook policy and contemplated that Royal and Northbrook would ultimately contribute by equal shares to payment of the General Mills claim: "When Northbrook recognizes its obligation, both Northbrook and Royal will contribute equally to the defense and indemnity of Shade subject to exhaustion of limits." Footnote 18, however, alluded to the possibility that, if "pro-rata allocation of liability among defendants is available," Northbrook would make the largest payment to fund IPS's pro rata liability for the loss.

The testimony of Parr revealed that Royal harbored a distinct agenda. Upon learning of the loss, the insurer established a reserve of only $200,000. In an internal communication discussing this reserve, Parr stated, "My gut tells me that we can push all of the liability on IPS and escape without making a significant indemnity payment." In a narrative report dated June 27, 1994, Parr stated that the contamination was "solely caused by IPS" and questioned whether Shade had any liability for the General Mills claim. "The only potential liability against Shade Foods" revolved around the possibility that it negligently allowed the contaminated almonds to pass "through their quality control." He thought Shade might be liable under Kansas law of "strict liability in tort for the defective product," but it would then have a claim against IPS for such damage.[16] "As a result, the real liability for the defective product is on IPS." The report estimated that the claim's "settlement value with liability factors applied" was between $100,000 and $200,000.

Parr thought he communicated to Stettler the substance of Royal's position by telling him that Royal would not pay any indemnity for IPS's negligence. In late October, Royal arranged for a meeting with Shade, at the San Francisco office of its counsel, Robert Phelps, to discuss ways of inducing Northbrook to recognize its coverage obligations. Royal's own coverage was not discussed. The October meeting led to the later meeting on January 5, 1995, in Kansas City, which was attended by Northbrook representatives.

Though accounts of the January 5 meeting differ, all testimony agrees that Royal clearly informed Shade of its position in a conference call between

---

[16] At trial, Parr explained that he meant Kansas, though the report says Missouri.

Parr, Angell, and Phelps shortly after the meeting. Parr then told Phelps that the most Royal was willing to pay as indemnity for the General Mills claim was $150,000. Angell later added that Royal would require that Shade give a policyholder release from all claims as a condition for making such a payment.

Parr and Angell made a distinction between Royal's coverage and its obligation to indemnify for Shade's liability, which reflected the brief discussion of pro rata liability in footnote 18 of the coverage letter. Viewing Shade's liability in terms of the relative negligence of Shade and IPS, they characterized this offer as being "generous" and consistent with their coverage letter. For his part, Stettler viewed Royal as trying to "weasel out of" its previous commitment. And Phelps objected that the coverage letter never suggested the possibility of such a steep discount on the General Mills claim.

We find two significant themes in Royal's correspondence with Shade's attorney during the first six months of 1995. First, Royal consistently measured Shade's potential liability to General Mills solely in terms of comparative negligence, without taking into account theories of strict liability. Second, Royal raised the other-insurance clause as a limitation on its obligation to indemnify Shade.

Parr appeared to view Shade's only exposure to liability to General Mills as resting on the possibility that Shade was negligent in failing to "catch the contamination problem." At trial, he confirmed that Royal was willing to pay the General Mills claim up to coverage limits only if Shade were 100 percent negligent—an unlikely possibility on the facts. Angell contended that Shade would not be subject to joint and several liability for negligence under Kansas law, thereby reducing its liability to its "pro rata contribution to the cause" of General Mills' damages. In other correspondence, Angell and Parr repeatedly estimated that Shade's liability to General Mills was not likely to be more than 5 or 10 percent of the General Mills claim.

Royal's tunnel vision in focusing only on comparative negligence was linked to another failure: it never seriously evaluated the choice-of-law issues necessary to analyze Shade's liability to General Mills under theories of strict liability. Royal's correspondence and internal memos contain no mention of Minnesota law, which in fact governed Shade's liability to General Mills, but contain allusions to California, Kansas, Missouri and even Georgia law. Parr acknowledged that "no one knew" what law would apply. Royal's failure to investigate and resolve choice-of-law issues prevented it from seriously analyzing liability for the loss under theories of

strict liability, such as the implied warranty of merchantability under Minnesota law.

In a series of letters, Angell made clear that he viewed the other-insurance clause as a limitation on Royal's indemnity obligation. In a letter dated February 13, 1995, Angell stated that "Royal's ultimate payment in indemnity for Shade's share of the total liability" would take into account "the application of the other insurance clauses in both the Royal and Northbrook policies under which Shade is an insured." In a later letter, he suggested that Royal reserved the right to raise the other-insurance clause as a defense to coverage if Shade did not seek Northbrook's consent to a settlement. Finally, in a letter dated April 12, 1995, he claimed that "[t]hree primary factors control what Royal is obligated to pay." The third of these factors was: "(3) what portion of Shade['] s liability must be paid by Northbrook pursuant to the other insurance provisions of the policy."

It is not clear whether Parr shared Angell's legal interpretation of the other-insurance clause. In a letter dated February 27, 1995, he indicated that Royal was willing to make a contribution of 5 or 10 percent of Shade's liability to General Mills "and retain the right to pursue Northbrook for half that amount." But according to Phelps, Parr was adverse on practical grounds to paying more than Royal's pro rata share of coverage. Phelps recalled that "the gist of the comment that he made to me was that he wasn't willing to do that [indemnify Shade and secure an assignment of Shade's rights against Northbrook] because in his experience, once you pay out the money, once the money goes out the door, you never get it back."

For its part, Shade maintained that, while it was not at fault, it was still legally responsible for the whole amount of the General Mills loss. In mid-December, Stettler told Parr that General Mills would "want their money soon," and Shade would be looking to Royal for indemnity. In a letter dated February 24, 1995, Phelps informed Parr that Shade was "under significant pressure" from General Mills to settle the claim and made a formal demand on Royal to pay the claim according to "the terms of Royal's acknowledgment of coverage" in its letter of October 12, 1994. The record leaves no doubt that Royal understood that Shade was at risk of losing its important relationship with General Mills by delaying settlement of the claim. In a letter to Angell dated March 29, 1995, Shade's counsel complained, "Shade has found itself caught in a dispute between its insurers that endangered its relationship with General Mills . . . ." But according to Phelps, Royal responded by blaming Northbrook for the impasse.

Apart from its offer to pay a small fraction of General Mills' loss, Royal took two other initiatives for settlement. In a letter dated March 15, 1995,

Angell proposed a five-party arbitration proceeding, including General Mills, IPS, Shade, Northbrook and Royal, conducted by the Defense Research Institute. Shade objected that it was unfair to draw General Mills into an arbitration and was unwilling to submit the dispute to arbitration before an organization sponsored by the insurance industry. Later, Angell suggested that Royal and Shade join as coplaintiffs in an action against IPS and Northbrook.

By March 1995, Stettler considered that General Mills was running out of patience, and asked Royal to consent to a settlement paid out of its own funds. After a period of negotiation, Royal agreed to consent to the settlement under the customary terms of a general release and assignment. Shade paid General Mills $1,347,932.20 in two separate payments in late April and May 1995.

### 2. *Relevance of Policy Limits*

In attacking the jury's finding that it breached the implied covenant of good faith and fair dealing toward Shade, Royal claims that as a matter of law it could not breach the implied covenant in refusing to settle the claim because Shade never faced any exposure to liability beyond its policy limits. It points to the fact that the General Mills claim never exceeded an estimated $1,348,211, while its policy limits were $2 million per occurrence.

It is true that the early decisions holding liability insurers liable in tort for breach of the implied covenant involved the insurers' refusal to settle claims within policy limits when there was a "great risk of a recovery beyond the policy limits . . . ." (*Comunale v. Traders & General Ins. Co., supra,* 50 Cal.2d at p. 659; *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 429-431 [58 Cal.Rptr. 13, 426 P.2d 173].) A consideration of the insured's exposure to liability in excess of policy limits continues to be a significant "factor in determining the reasonableness of the claimant's settlement offer" (*Camelot by the Bay Condominium Owners' Assn. v. Scottsdale Ins. Co.* (1994) 27 Cal.App.4th 33, 51 [32 Cal.Rptr.2d 354]), and the absence of such exposure to excess liability may under appropriate facts militate strongly against a finding of the insurer's bad faith. (*Id.* at pp. 51-53.) But the doctrine of insurance bad faith now occupies a much larger area than potential liability to third parties for a recovery in excess of policy limits; it extends to first party insurance coverage (*Gruenberg v. Aetna Ins. Co., supra,* 9 Cal.3d at p. 574) and allows recovery for consequential damages, such as mental suffering or economic loss, unrelated to policy limits. (*Larraburu Bros., Inc. v. Royal Indem. Co.* (9th Cir. 1979) 604 F.2d 1208, 1215.) A line of decisions

has found liability insurers liable for bad faith without relying on the risk of excess liability. (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 13 [68 Cal.Rptr.2d 837]; *Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 514 [46 Cal.Rptr.2d 845] [dicta]; *Bodenhamer v. Superior Court* (1987) 192 Cal.App.3d 1472, 1476 [238 Cal.Rptr. 177]; *Clark v. Bellefonte Ins. Co.* (1980) 113 Cal.App.3d 326, 337 [169 Cal.Rptr. 832] [dicta]; cf. *MacGregor Yacht Corp. v. State Comp. Ins. Fund* (1998) 63 Cal.App.4th 448 [74 Cal.Rptr.2d 473] [implied duty in absence of tort liability].) As explained in a leading text, "[a]bsent an excess judgment, there can be no bad faith action based on declining a reasonable offer to settle within policy limits. However, the insurer's [refusal] to settle may be actionable on some other basis." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:359, p. 12B-35.)

### 3. *Analysis of Evidence*

 Arguing for the sufficiency of the evidence to support the jury's finding, Shade relies chiefly on evidence tending to show Royal failed to make good faith efforts to negotiate a settlement. In a complex case such as the present, the duty to accept reasonable settlements, included within the implied covenant of good faith and fair dealing (*Gruenberg v. Aetna Ins. Co., supra,* 9 Cal.3d at p. 573; *Crisci v. Security Ins. Co., supra,* 66 Cal.2d at p. 430), would indeed be meaningless if it did not entail a duty to negotiate toward a reasonable settlement. (*Garner v. American Mut. Liability Ins. Co.* (1973) 31 Cal.App.3d 843, 848 [107 Cal.Rptr. 604]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 12:290, p. 12B-19; but see *Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 877 [110 Cal.Rptr. 511].) We find to be of particular probative value evidence that Royal (1) concealed its unwillingness to provide significant coverage until Shade was under urgent business pressure to accept a settlement; (2) failed to fairly evaluate Shade's exposure to liability by neglecting the possibility of strict liability and pertinent choice of law issues; and (3) relied on the other-insurance clause as a limitation on its indemnity obligation.

With respect to the first point, we note that an insurer may breach the implied covenant by unreasonably coercing an insured to contribute to a settlement (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co., supra,* 59 Cal.App.4th at p. 15) or by delaying payment until the insured is subject to loss of business goodwill. (*Bodenhamer v. Superior Court, supra,* 192 Cal.App.3d at pp. 1476-1479.) The record here has elements of both situations. While pursuing a strategy of shifting responsibility to Northbrook and avoiding any significant indemnification, Royal gave Shade vague oral

assurances that it would stand behind a settlement, which was apparently confirmed by the coverage letter dated October 12, 1994. Only a footnote and certain boilerplate language gave any indication of Royal's actual agenda. When Shade learned in January that it did not in fact have Royal's backing, it was under urgent pressure from General Mills to pay for damaged product, and it had effectively forgone the possibility of submitting coverage issues to arbitration prior to payment. Shade's options then had narrowed to two: pay the General Mills claim and bear the burden of bringing an action against its insurers for indemnification or face the loss of a vital business relationship.

In *J.B. Aguerre*, the insured alleged that it yielded to the insurer's insistence that it pay a small portion of a settlement with a third party because it feared exposure to punitive damages if the settlement were not consummated. The court agreed in concept with the plaintiff's theory of liability: "an insurer potentially can be liable for unreasonably coercing an insured to contribute to a settlement fund, even though (by definition) there is no 'excess judgment' where a case is settled." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co., supra,* 59 Cal.App.4th at p. 15.) But it held that the plaintiff had failed to plead facts sufficient to show that the insurer had acted in such an unreasonable manner.

In *Bodenhamer*, a jewelry store was burglarized and jewelry belonging to 23 customers was stolen. The jeweler possessed a business owners policy, which provided liability coverage as well as certain forms of first party coverage. In reversing a summary judgment for the insurer, the court found a triable issue of bad faith "in the context of third party claims." (*Bodenhamer v. Superior Court, supra,* 192 Cal.App.3d at p. 1476.) The court observed that the insured's "position is not simply that [the insurer] failed to evaluate their customers' claims or failed to settle but that [the insurer] with knowledge of the validity of the claims and the injury delay could do to petitioners' business, deliberately delayed settlement." (*Id.* at p. 1477.)

Relying in part on the analogies afforded by *J.B. Aguerre* and *Bodenhamer*, we conclude that the jury could draw a reasonable inference of Royal's bad faith from evidence that it concealed its unwillingness to contribute significantly to payment of General Mills' claim, with knowledge of the injury to Shade's business that would result from failure to pay the claim, and ultimately placed Shade in a position in which it was compelled to pay the full amount of the claim from its own funds and assume the burden of bringing suit against its insurers for reimbursement.

Second, the record reveals that Royal evaluated Shade's exposure to liability solely in terms of negligence, ignoring the far more serious possibilities that Shade would be strictly liable in tort or under the implied

warranty of merchantability. We express no opinion on the existence of strict liability in tort since this basis of liability was not submitted to the jury, but the fact that Royal did not take the possibility of such strict liability into account reflects its inadequate analysis of Shade's potential liability. Royal's failure to consider implied warranties caused it to miss entirely the basis on which Shade's liability to General Mills was ultimately adjudicated.

Royal's narrow focus on generally applicable principles of negligence reflected in part its failure to investigate choice-of-law issues. As a relatively new development in the law, strict products liability in tort varies significantly from state to state. (Prosser & Keeton, Torts (5th ed. 1984) §§ 97, 99-101, pp. 690-692, 694-710.) The privity requirements relating to the implied warranty of merchantability similarly appear in three distinct versions of the Uniform Commercial Code. (Hawkland, Sales & Bulk Sales (3d ed. 1976) § 2-318, pp. 94-96.) Without making a preliminary assessment of what state law would govern, Royal could not make any serious attempt to evaluate Shade's exposure to liability under these theories.

The choice-of-law issue was in fact a simple one—the contract between Shade and General Mills selected Minnesota law—but Royal instead raised the misleading and unfounded assumption that Kansas law might apply, with no apparent consideration of other alternatives. This poorly examined reliance on Kansas law caused it to further devalue Shade's exposure to liability for negligence by questioning whether it would be subject to joint and several liability.

The implied covenant entails a duty to pay a reasonable amount in settlement "based on a fair appraisal of potential exposure and the strength of each case." (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 793 [244 Cal.Rptr. 655, 750 P.2d 297].) It was impossible under the facts of the present case to make a fair appraisal of Shade's exposure to liability without considering theories of strict liability and resolving (or narrowing) preliminary choice-of-law issues. As noted earlier, an insurer may be found in bad faith for failing to consider evidence relevant to the issues of liability. (*Mariscal v. Old Republic Life Ins. Co., supra,* 42 Cal.App.4th at p. 1624; *Hughes v. Blue Cross of Northern California, supra,* 215 Cal.App.3d at p. 846; *Betts v. Allstate Ins. Co., supra,* 154 Cal.App.3d 688.) By the same logic, we think the jury could draw an inference of bad faith from Royal's failure to evaluate pertinent theories of liability, in the face of the insured's insistence that it was fully responsible for General Mills' loss.

Third, we consider that Royal's mistaken reliance on the other-insurance clause as limiting its obligation to indemnify Shade might reasonably be

viewed as supporting a finding of bad faith. The implied covenant of good faith and fair dealing requires the insurer to "take into account the interest of the insured and give it at least as much consideration as it does to its own interest." (*Comunale v. Traders & General Ins. Co., supra,* 50 Cal.2d at p. 659; *Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at pp. 818-819; *Crisci v. Security Ins. Co., supra,* 66 Cal.2d at p. 429.) Thus, "in deciding whether or not to compromise the claim, the insurer must conduct itself as though it alone were liable for the entire amount of the judgment," without taking into account policy limits. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau, supra,* 15 Cal.3d at p. 16.)

The other-insurance clause, as we have seen, does not excuse the insurer from discharging its independent obligation to indemnify the insured up to policy limits, though it gives the insurer a right to an adjudication allocating the indemnity obligation between it and the other insurer. Royal's position that the clause limited its indemnity obligation might reasonably be viewed as reflecting more than a mistaken interpretation of the policy: It effectively put Royal's interest in securing an allocation of the indemnity obligation with the other insurer above the insured's interest in securing payment of the third party claim. Royal's implied obligation to conduct itself as if it were alone liable for the claim demanded that it pay the claim within policy limits and then assume the burden of forcing the other insurer to contribute its portion of liability through a subrogation action or other means.

We recognize that the record provides no more than a modest degree of support for each of the inferences we have examined, but we consider that each inference draws strength from the others and therefore the record as a whole discloses a reasonable basis for the jury's finding that Royal breached its implied obligation of good faith and fair dealing toward Shade. Accordingly, we affirm the award of $447,637.28 to Shade as compensatory damages for attorney fees and expenses, plus interest.[17]

C. *Punitive Damages*

 As we have noted earlier, the evidence required to support an award of punitive damages for breach of the implied covenant of good faith and fair dealing is "of a different dimension" from that needed to support a finding of bad faith. (*Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1286.) A marginally sufficient case of bad faith is not likely to prove malice

---

[17]We reject Shade's contention that the measure of damages under *Brandt v. Superior Court, supra,* 37 Cal.3d at page 819, includes attorney fees incurred in this appeal. (*Burnaby v. Standard Fire Ins. Co.* (1995) 40 Cal.App.4th 787 [47 Cal.Rptr.2d 326].)

or oppression by clear and convincing evidence. In the present case, we have concluded that inferences drawn from three categories of evidence, taken together, suffice to support the jury's finding of bad faith, but it is an entirely different issue whether this evidence supports, by clear and convincing evidence, a finding of malice and oppression.

Royal unquestionably misled Shade for a time as to its willingness to indemnify the General Mills claim, but it made its position clear in January 1995—eight months after receiving notice of the claim and only three months after issuing the particularly misleading coverage letter. Though unfair to Shade, this conduct falls far short of subjecting Shade to "cruel and unjust hardship in conscious disregard of [its] rights" or displaying a "willful and conscious disregard of the rights . . . of others." Again, Royal lacked any reasonable justification for failing to adequately assess Shade's exposure to liability and invoking the other-insurance clause as a defense to its indemnity obligation, but, in light of the complexity of the coverage and liability issues and the purely economic character of the losses, we do not think its conduct can reasonably be regarded as meriting the degree of opprobrium associated with the term "despicable." We therefore hold that the record does not support the award to Shade of $8 million in punitive damages against Royal.

### D. *Trial Errors*

#### 1. *Bifurcation*

In this appeal, Royal contends that the trial court was required by precedents in the field of insurance law to sever the trial of the liability issues and the coverage issues and to try them before separate juries. Shade disputes this interpretation of the law and claims that Royal waived its objection in the trial court. We will first examine the evidence of waiver in the trial court.

Early in the lawsuit, both insurers filed motions to bifurcate the trial of issues pertaining to insurance coverage and bad faith liability. On November 2, 1995, the court denied the motions without prejudice to their being renewed prior to trial. Northbrook did not renew its motion. Royal, however, presented an extensive motion in limine regarding the order of proof that contained a brief request for separate juries to consider issues relating to the insureds' liability for the almond contamination and the insurer's liability for breach of the implied covenant of good faith and fair dealing toward Shade. In oral arguments on the motion, Royal's counsel tentatively suggested to the court that it "might be a case that you want to consider having two

separate juries for." In contrast, Northbrook's counsel stated that he was "not pushing for two juries."

We think that Royal did enough to preserve the issue of severance under Code of Civil Procedure section 1048, though it did waive a request under Code of Civil Procedure section 598 by failing to raise it 30 days before trial. It is, however, important for our analysis to note that Northbrook unequivocally waived any claim of error for failure to bifurcate the trial.

In general, "[w]hether there shall be a severance and separate trials on issues in a single action is a matter within the discretion of the trial court . . . ." (*Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1086 [234 Cal.Rptr. 835].) Similarly, the court has discretion whether or not to order different juries for separate trials in an action. (See *Jordan v. Guerra* (1943) 23 Cal.2d 469, 471 [144 P.2d 349].) But in the field of insurance law, the consolidated trial of liability and coverage issues presents pitfalls that have been held to compel separate trials before different juries, leaving the matter outside the discretion of the court. We must consider whether the trial court's discretion was constrained by governing precedents.

In *State Farm etc. Ins. Co. v. Superior Court* (1956) 47 Cal.2d 428 [304 P.2d 13], the insurer, State Farm, brought an action for declaratory relief against its insured, who was involved in an automobile accident, and relied on an exclusion in its policy applying to use of an automobile " 'for carrying persons for a charge.' " (*Id.* at p. 431.) Subsequently, the riders in the insured's automobile filed actions for personal injury against him, alleging negligence and willful misconduct. The trial court consolidated the declaratory relief action and the personal injury actions for trial before the same jury. On appeal, the Supreme Court noted that the order of consolidation required State Farm to take apparently inconsistent positions before the jury: In the declaratory relief action, it would contend that the riders were passengers "for a charge" within its policy exclusion; in the personal injury actions, it would urge that the riders were guests within the meaning of the guest statute, so that the insured would be liable only for willful misconduct. The tests for determining the riders' status were not the same under the guest law and the policy exclusion. Moreover, the consolidated trial would require disclosure of the insured's liability insurance before the same jury that would consider the personal injury actions. Under these circumstances, the court held that the consolidation of the two actions was an abuse of the court's discretion.

The decision in *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266 [258 Cal.Rptr. 66] bears a partial analogy to the portion of

the present case involving Shade's suit against IPS and Northbrook. The plaintiff leased property to a tenant under a lease requiring the tenant to purchase general liability insurance. The tenant contaminated the property with oil spills. The plaintiff then sued the tenant for negligence and the tenant's insurer under a theory of third party beneficiary rights. But unlike the present case, the insurer moved to sever the liability and insurance coverage trials, relying on Evidence Code section 1155, which precludes the use of evidence of the tortfeasor's insurance in a negligence action. On appeal, the court held that the trial court abused its discretion in denying the insurer's motion to sever. (See also *Pacific Estates, Inc. v. Superior Court* (1993) 13 Cal.App.4th 1561, 1566, fn. 5 [17 Cal.Rptr.2d 434]; *Rose v. Royal Ins. Co.* (1991) 2 Cal.App.4th 709, 718 [3 Cal.Rptr.2d 483]; *Zahn v. Canadian Indem. Co.* (1976) 57 Cal.App.3d 509, 514 [129 Cal.Rptr. 286].)

Other decisions involve direct actions by third parties against an insurer alleging unfair claims settlement practices during the nine-year period between *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] which authorized such suits, and *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], which reversed the *Royal Globe* decision. These decisions prohibited " 'a suit simultaneously against an *insured* for negligence and against an insurance company for bad faith refusal to settle . . . .' " (*Smith v. Interinsurance Exchange* (1985) 167 Cal.App.3d 301, 303 [213 Cal.Rptr. 138]; *Industrial Indemnity Co. v. Mazon* (1984) 158 Cal.App.3d 862, 865 [204 Cal.Rptr. 885].)

This brief review of the case law suggests that, while it may be an abuse of discretion to try issues of liability and coverage before the same jury, the question must be decided on a case-by-case basis. The case at bar differs from the *State Farm* decision in that it did not involve the peculiar problem of the guest statute, from the *Omaha Indemnity* decision in that the tortfeasor's insurer here waived objections to a consolidated trial, and from the *Royal Globe* decisions in that it did not involve a third party suit, but, like all these decisions, it presents the possibility of prejudice arising from a consolidated trial of liability and insurance coverage issues.

In analyzing the peculiar circumstances of the present case, we wish to emphasize the narrow focus of our analysis. First, IPS and Northbrook have waived objections to the consolidated trial of liability and coverage, and Royal has no standing to complain of prejudice to these parties. Second, an insured may itself bring an action against its insurer, joining coverage and bad faith claims, without any potential for prejudice. In such a case, the only

relevant issue concerns order of proof. (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1986) 184 Cal.App.3d 1428, 1431, 1433 [229 Cal.Rptr. 409].) Thus, the portion of the case involving Shade's suit against Royal for indemnification and bad faith is immune from objection.

In this appeal, Royal may complain of prejudice arising from a consolidated trial of liability and coverage only with respect to the adjudication of Shade's liability to General Mills. This adjudication involved peculiar difficulties that could be only partially obviated by separate trials. General Mills was not a party to the proceeding; hence, the adjudication of Shade's liability to General Mills would necessarily be conducted in a nonadversarial context whether or not separate trials were ordered. Again, since Shade had already made the settlement payment, the adjudication of Shade's liability to General Mills involved circumstances that would almost inevitably allow the jury to speculate that insurance was involved—the adjudication would be meaningless except as one step in the determination of the insurer's liability to Shade.

Moreover, the question of Shade's liability to General Mills represented a small portion of the case, involving the same factual determinations as were involved in the question of IPS's liability to Shade. A separate trial of this issue before a different jury would involve duplicative adjudications with a consequent waste of judicial time. Though considerations of judicial economy should not dictate an unfair procedure, they are entitled to some consideration in the trial court's exercise of discretion. It is worth noting that such considerations tended to favor consolidating the issue of Shade's liability to General Mills with other necessary adjudications.

The possibility of prejudice in the present case was minimized by instructing the jury that "[w]hether insurance exists for the claim by General Mills or for the claim by Shade Foods has no bearing upon any issue in this phase of the case. [¶] You must not discuss or consider the existence or nonexistence of coverage for any purpose."

We conclude that, despite the undeniable advantages of conducting the trials of liability and insurance coverage before different juries, the trial court did not abuse its discretion, under these highly unusual circumstances, in ordering a consolidated trial before the same jury with an appropriate cautionary instruction.

### 2. *Evidence of Settlement Offers*

In its opening brief, Royal objects broadly to the admission of evidence of litigation conduct without providing specific citations to the

record. In its respondent's brief, Shade speculates that Royal intended to refer to discussions pertaining to the settlement proposal Northbrook offered shortly after the filing of the complaint. Royal's reply brief provides certain citations and limits the assignment of error to evidence of postfiling settlement discussions.[18] In fact, the record reveals that Royal is compelled to limit its assignment of error in this manner because it earlier waived any objection to the admission of evidence of prefiling settlement discussions.[19]

So far as revealed by citations to the record, Royal's assignment of error relies on evidence relating to Northbrook's settlement discussions in the five-week period after filing of the complaint and to the testimony of Northbrook's witness, Michael Brady, giving a brief summary of later settlement discussions. The documentary evidence includes Shade's letter dated June 2, 1995, to Northbrook demanding acceptance of an offer of settlement by June 15, 1995, Northbrook's letter dated June 14, 1995, to Shade purporting to accept the offer, and a letter from Northbrook to Royal dated July 6, 1995, discussing Shade's settlement offer and alluding to letters received the previous month from Royal. This evidence, as we have seen, was vital to Northbrook's defense that it accepted Shade's settlement offer, but it contained several mentions of Royal's own settlement discussions. Royal objected under Evidence Code section 1152 to admission of the evidence, but its objection was overruled.

Royal suggests obliquely that the litigation privilege of Civil Code section 47, subdivision (b) bars admission of the evidence. The contention is vulnerable to multiple objections. It was not raised in the trial court. Moreover, it is unclear whether the initial settlement negotiations had the requisite connection with a judicial proceeding because Royal has failed to show when it accepted service of the complaint. More fundamentally, " '[t]he privileges of Civil Code section 47, unlike evidentiary privileges which function by exclusion of evidence [citation], operate as limitations upon liability.' . . . . Indeed, on brief reflection, it is quite clear that section 47(2) has never been thought to bar the *evidentiary* use of every 'statement or publication' made in the course of a judicial proceeding . . . . Accordingly, when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding

[18]We will consider the assignment of error despite the absence of citations to the record in the opening brief because (1) the deficiency in the opening brief did not prejudice Shade, which correctly surmised the relevant record, and (2) it was cured in the reply brief. (Cal. Rules of Court, rule 15(a).)

[19]Despite its clear waiver of any objection to prefiling discussions in a motion in limine, Royal includes in its reply brief citations to a number of prefiling documents. Relying on the record of waiver, we decline to consider these documents.

may be used for evidentiary purposes in determining whether the individual acted with the requisite intent." (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168 [232 Cal.Rptr. 567, 728 P.2d 1202].) It follows that statements made during a judicial proceeding may also be used to prove the existence of bad faith in an action against an insurer.

The objection under Evidence Code section 1152 presents somewhat of a similar defect. Section 1152, subdivision (a), provides that offers of compromise are inadmissible to prove the liability of the offeror for the loss or damage. In insurance litigation, "[t]he language of this section does not preclude the introduction of settlement negotiations if offered not to prove liability for the original loss but to prove failure to process the claim fairly and in good faith." (*White v. Western Title.Ins. Co.* (1985) 40 Cal.3d 870, 887 [221 Cal.Rptr. 509, 710 P.2d 309].) Hence, the trial court properly admitted evidence of Northbrook's purported acceptance of Shade's settlement offer as being relevant to the issue of Northbrook's bad faith. Though this evidence inevitably contained allusions to Royal's participation in settlement negotiations, we do not find prejudicial error. The evidence added nothing of importance to the mass of evidence concerning the impasse between Shade and Royal. Moreover, to mitigate any prejudice, the court offered to give a limiting instruction and to allow Royal to explain its own response to Shade's offer.

### 3. *Interrogatory Answers*

Royal also complains of the introduction, over its objection, of two sets of answers to contention interrogatories. Shade offered the answers as evidence of Royal's bad faith because they revealed that Royal departed from the coverage position expressed in its letter of October 12, 1994, during the course of the litigation. We think the evidence was subject to a strong relevance objection. Royal was entitled to reserve all rights to deny coverage, and this reservation of rights entailed a right to raise new reasons for denying coverage and to discard previous reasons. On the other hand, we can conceive of circumstances in which a shifting position with respect to coverage might strengthen an inference of bad faith. In our opinion, the admission of the evidence—like other evidence of marginal probative value—lay within the discretion of the trial court, which must be upheld on appeal if supported by any reasonable inference. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32 [44 Cal.Rptr.2d 796].) We therefore decline to find error on the basis of relevance. Moreover, for the reasons discussed above, the evidence was not subject to an evidentiary privilege under Civil Code

section 47, subdivision (b). (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc., supra,* 42 Cal.3d at p. 1168.)

### 4. *Jury Instruction*

Royal contends that the trial court erred by using an elaborated version of BAJI No. 12.98, which borrowed from Insurance Code section 790.03, subdivision (h), for the purpose of instructing the jury on factors relevant to the determination of bad faith. We see no merit in the contention. It is true that *Moradi-Shalal v. Fireman's Fund Ins. Companies, supra,* 46 Cal.3d 287 bars private causes of action based on section 790.03. But violations of the section "may evidence the insurer's breach of duty to its insured under the implied covenant" of good faith and fair dealing with its insured. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 14:45.21, p. 14-15.)

Next, Royal argues that the trial court erred by rejecting its proposal to instruct pursuant to BAJI No. 12.95 and using instead BAJI No. 12.92. The former instruction reads in pertinent part: "The implied obligation of good faith and fair dealing in an insurance policy imposes a duty on an insurance company to accept a reasonable offer to settle a claim against the person insured if the offer is within the limits of the insurance coverage and if there is a substantial likelihood of recovery against the person insured for an amount in excess of the insurance coverage." Though intended for use in third party liability insurance cases, BAJI No. 12.95 was inapplicable to the present case; it is based on the traditional grounds for finding bad faith where the claim exposes the insured to liability beyond coverage limits. Here, Shade based its case on a distinct theory predicating bad faith liability on the rejection of a claim within policy limits. Earlier in this opinion, we have closely examined this theory and concluded that it presented a valid basis for recovery of bad faith damages. (See *ante,* pp. 905-906.)

BAJI No. 12.92 is crafted for use in bad faith cases involving first party insurance coverage. The instruction provides: "An insurance company which fails to deal fairly and in good faith with its insured by refusing unreasonably to pay the insured for a valid claim covered by the policy is liable for all damages resulting from such conduct." But, as we have seen, the reasonableness of the insurer's conduct in denying a claim is relevant to bad faith liability both in cases involving first party insurance coverage and general liability insurance coverage. (See *ante,* pp. 878, 887-888, 906.) In either case, the insurer's unreasonable denial of a claim may give rise to liability for bad faith if the unreasonableness rises to the level of unfair dealing. BAJI

No. 12.92 accurately states this general principle. In contrast, BAJI No. 12.95 ties the issue of reasonableness to acceptance of an "offer to settle a claim"—an issue that disappeared after Shade paid the General Mills claim on its own initiative. We conclude that the trial court acted properly in using BAJI No. 12.92 under the peculiar circumstances of the present case.

We also see no merit in Royal's objection to the instructions based on BAJI Nos. 12.96 and 12.97, which deleted references to the limits of insurance coverage. Royal requested both of these model BAJI instructions, but since it provided insurance with limits of $2 million that was well above the amount of the claim, the instructions could not be given without deleting references to the limits of coverage. The real basis for Royal's objection appears to be the contention, discussed above, that it could not be liable for bad faith in the absence of an exposure of the insured to liability in excess of policy limits.

## DISPOSITION

We reverse the portion of the judgment for punitive damages against Northbrook in the amounts of $2 million and $3 million and the judgment against Royal for punitive damages in the amount of $8 million. We also reverse the portion of the judgment against Northbrook jointly awarding IPS and Shade $1 million as compensatory damages for liability insurance coverage and the portion of the judgment against Royal awarding Shade $1,054,419.50 as compensatory damages for liability insurance coverage and remand the case to the trial court for modification of these portions of the judgment in compliance with this opinion. In all other respects the judgment is affirmed. Each side shall bear its own costs on appeal.

Strankman, P. J., and Stein, J., concurred.

A petition for a rehearing was denied March 29, 2000, and the opinion was modified to read as printed above.